SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Suzanne Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioning Creditors, Lapidem Ltd. and Mascini Holdings Limited*

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| **KIRWAN OFFICES S.À R.L.,** | : | **Case No. 16-22321 (RDD)** |
| | : | |
| Debtor. | : | **Involuntary Petition Pending** |
| | : | |

**NOTICE OF MOTION OF PETITIONING CREDITORS, LAPIDEM LTD. AND
MASCINI HOLDINGS LIMITED, TO TERMINATE PLAN EXCLUSIVITY PERIODS**

**PLEASE TAKE NOTICE** that Lapidem Ltd. ("Lapidem") and Mascini Holdings Limited ("Mascini" and together with Lapidem, the "Petitioners"), by and through its undersigned counsel, hereby files the *Motion of Petitioning Creditors, Lapidem Ltd. and Mascini Holdings Limited, to Terminate the Debtors' Plan Exclusivity Periods* (the "Motion"), attached hereto as Exhibit A:

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion may be scheduled before the Honorable Robert D. Drain, United States Bankruptcy Judge for the Southern District of New York, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), 300 Quarropas Street, Room 118, White Plains, NY 10601. In the event that a hearing on the Motion is scheduled, a supplementary notice setting

forth the date, time, and objection deadline for such hearing will be filed with the Bankruptcy

Court on the docket of Case No. 16-22321 (the "<u>Exclusivity Hearing Notice</u>").

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the

Motion must be made in writing and (a) filed with the Bankruptcy Court no later than the

objection deadline provided in the Exclusivity Hearing Notice  (the "<u>Objection Deadline</u>") and

(b) served so as to be actually received by the following parties by the Objection Deadline:

(i) the Petitioning Creditors; (ii) the Debtors; (iii) Mr. Stephen Lynch; (iv) the Office of the

United States Trustee for the Southern District of New York; (v) the Securities and Exchange

Commission; (vi) the Internal Revenue Service; and (vii) any such other party entitled to notice

pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b).

**PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard.

Dated: New York, New York

      March 17, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: */s/ Jay M. Goffman*                 
     Jay M. Goffman
     Mark A. McDermott
     Suzanne Lovett
     Four Times Square
     New York, New York 10036
     (212) 735-3000

     *Counsel to Petitioning Creditors*

Exhibit A

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Suzanne Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioning Creditors, Lapidem Ltd. and Mascini Holdings Limited*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| **KIRWAN OFFICES S.À R.L.,** | : | **Case No. 16-22321 (RDD)** |
| | : | |
| Debtor. | : | **Involuntary Petition Pending** |
| | : | |

## MOTION OF PETITIONING CREDITORS, LAPIDEM LTD. AND MASCINI HOLDINGS LIMITED, TO TERMINATE PLAN EXCLUSIVITY PERIODS

Lapidem Ltd. ("Lapidem") and Mascini Holdings Limited ("Mascini" and together with Lapidem, the "Petitioners"), the largest unsecured creditors of Kirwan Offices S.à r.l. ("Kirwan" or the "Debtor"), by and through their undersigned counsel, respectfully submit this motion (the "Motion") for entry of an order, pursuant to section 1121(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), terminating Kirwan's exclusive plan filing and solicitation periods. In support of this Motion, Lapidem and Mascini respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Petitioners are the 99.9944% owners, and holders of over 99% of the debt, of Kirwan, a Luxembourg entity. Kirwan's only asset is a Russian subsidiary, OOO Promneftstroy ("PNS"). Kirwan owns 100% of PNS's equity. In 2007, Petitioners and certain other parties

came together to make an investment through Kirwan and PNS: the acquisition of 100% of the shares of Yukos Finance B.V. ("Yukos Finance"), a Dutch entity, in an auction by the bankruptcy estate of its parent company, OAO "Yukos Oil Company" ("Yukos Oil"). A third party, Stephen Lynch, was also a party to the transaction, albeit in a limited role described further below. On August 15, 2007, PNS successfully participated in the Yukos Finance auction with a winning bid of $309 million. The entire purchase price was funded by Petitioners through loans provided in 2007 and 2011 to Kirwan, who in turn loaned the proceeds on to PNS. Those loans remain unpaid.

2.        However, very shortly after PNS won the auction, PNS became embroiled in litigation with entities connected to the former shareholders and management of Yukos Oil. The former shareholders and management challenged recognition, in the Netherlands courts, of the Yukos Oil bankruptcy proceedings in Russia and, it followed, the sale of Yukos Finance to PNS by the court-appointed receiver of the Yukos Oil estate, Mr. Eduard Rebgun. The former shareholders and management also sought to enforce attachments over the Yukos Finance shares with respect to asserted claims totaling several billion dollars. Over the ensuing years, highly complex litigation was spawned in the Netherlands, Russia, the United Kingdom and several courts in the United States, including in New York City and Texas. The litigation has lasted over eight years and has been funded exclusively by Petitioners in the aggregate amount of over $35 million in the form of additional loans to Kirwan that also remain unpaid. To this day, PNS has still not succeeded in acquiring quiet title to the shares of Yukos Finance.

3.        However, PNS's litigation adversaries have recently made an offer to finally and fully settle this litigation for an amount equal to approximately $137.5 million. Petitioners believe that it is in Kirwan's best interests to accept this offer. While the offer is far less than the

2

debts that Kirwan owes, Petitioners believe that, given the probabilities of success and failure in the litigation, the litigation's great complexity and very slow pace, and the enormous costs and uncertainties of continuing the litigation, resolution of the litigation for the settlement amount is in Kirwan's and its stakeholders' best interests, and therefore should be accepted and implemented. Petitioners believe this is so, not only in their capacity as Kirwan's largest creditors – they hold over 99% of all claims against Kirwan – but also in their capacities as Kirwan's largest shareholders.

4.      Pursuant to Kirwan's governance documents, Petitioners have appointed four of Kirwan's five managers. The majority of Kirwan's managers agree that settlement of the litigation on the above terms is in the best interests of Kirwan and its stakeholders. However, there is a holdout – Mr. Stephen Lynch. As noted above, Mr. Lynch, who is a United States citizen, played a limited role in facilitating the original acquisition of Yukos Finance. Mr. Lynch's main contribution was to initially introduce certain of the financing investors in the consortium, and to act as the external face of the consortium in the transaction. For his efforts, Mr. Lynch was given .0056% of Kirwan's shares, a seat on Kirwan's board, the right to nominate himself as the sole General Director of PNS (whose role and responsibilities may be limited in any way that Kirwan as the sole shareholder so determines consistent with the parties' shareholders' agreement), and the potential to receive 10% of any net gain on the investment after deducting all operating expenses, capital contributions and loans provided to Kirwan by Petitioners. However, Mr. Lynch paid nothing for these interests, and he has not contributed one dime to the acquisition of Yukos Finance or the costs necessary to fund the litigation. Petitioners have funded every cent.

3

5.      Despite the fact that Mr. Lynch has absolutely no skin in the game; that Kirwan is hopelessly insolvent; and that Petitioners, as the largest creditors and sole ligation funders, believe that the $137.5 million offer is the best settlement possible under the circumstances, Mr. Lynch has actively interfered with settlement efforts in order to obtain a payday for himself.  He has acted unilaterally, in direct contravention of an arbitrator's ruling in July 2015 that he has *no* such authority under the governing documents.  He has demanded that there be no settlement discussions whatsoever without his consent, and he said that he would only consent to a settlement if he is bought off for $35 million – even though his interests are below $345 million in debt, and will be over $200 million under water if the proposed settlement is consummated.

6.      Mr. Lynch's conduct constitutes a gross abdication of his duty of loyalty, threatening to scuttle a potential nine figure settlement that Kirwan's largest creditors (and 99.9944% shareholders) want to consummate, even though it will leave them short by over $200 million.  Given Mr. Lynch's conduct, Petitioners concluded that the only avenue available for implementing a rational resolution of eight years of global litigation is the filing of this involuntary petition.  *See In re Kingston Square Assocs.*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997) (declining to dismiss an involuntary case where a single, ill-informed director held up debtor's legitimate restructuring efforts; director abdicated his fiduciary duties by acting solely in his own interests, and by refusing to support any efforts by debtors' stakeholders to develop out-of-court and in-court restructuring solutions that benefitted stakeholders other than himself).

7.      Indeed, the United States Bankruptcy Court is the only realistic forum for resolving intractable, global litigation and the governance issues that Mr. Lynch has fomented.  It is the only means for affording multiple settling parties the comfort of an order, with worldwide effect, that approves a reasonable settlement.  *See In re Fisher Island Invs., Inc.*, 778 F.3d 1172

4

(11th Cir. 2015) (bankruptcy court had core jurisdiction, in the context of an involuntary petition, to resolve intra-shareholder dispute over control of alleged debtor embroiled in global litigation). Accordingly, Petitioners are prepared to propose a plan of liquidation that will provide a vehicle for resolving, for the benefit of all parties, the global litigation that has engulfed PNS and Yukos Finance for the last eight years, and that will concomitantly bring to an end the meritless governance issues that Mr. Lynch has created to feather his own nest.

8.      Petitioners therefore request prompt termination of exclusivity so they can pursue their plan forthwith.  Separately, the Petitioners reserve their rights to seek standing to sue Mr. Lynch for breach of fiduciary duty.

## JURISDICTION

9.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is Bankruptcy Code section 1121(d).

## BACKGROUND

**A.      The Yukos Auction**

10.      On August 15, 2007, Mr. Eduard Rebgun, the Russian receiver of the Yukos Oil estate, conducted an auction for the sale of 100% of the shares of Yukos Finance.  Several entities, including Petitioners, participated in the auction.   At the time of the acquisition, Petitioner Mascini was ultimately majority-owned and controlled by Renaissance Capital ("Renaissance") and Petitioner Lapidem was ultimately majority-owned and controlled by entities affiliated with VR Capital Group, Ltd. ("VR Capital").  Renaissance is a Moscow-based investment bank. VR Capital is an asset management firm specializing in emerging markets and

distressed investments.  It has over $3 billion of assets under management.  Today, both Mascini and Lapidem are controlled by entities affiliated with VR Capital.  VR Capital affiliates have operations in the United States.  VR Capital and its chief executive, Richard Deitz, have been intimately involved in all aspects of Kirwan's and PNS's operations and the subsequent litigation.

11.      At the auction, Mr. Lynch was appointed to bid on behalf of PNS.  As described above, PNS submitted a successful bid of $309 million for Yukos Finance.  PNS was then acquired by Kirwan, the consortium's investment vehicle.  On September 10, 2007, PNS closed the purchase.  The plan was for PNS to resell the Yukos Finance shares at cost to Kirwan as soon as reasonably practicable following the  acquisition, leaving Kirwan holding the Yukos Finance shares directly and PNS free to bow out of the picture.  PNS was thus expected to have a relevance to the transaction measured in days.  As a result of the litigation described below, however, PNS has never gained title to the shares of Yukos Finance, and thus has been unable to complete the contemplated share transfer to Kirwan.

**B.**    **Kirwan's Capital and Governance Structure**

12.      Kirwan has three classes of shares.  Class A shares are held by Mascini, the majority shareholder and one of the Petitioners.  The Class A shares comprise approximately 60% of Kirwan's share capital.[1]  Class B shares are held by Lapidem, the other Petitioner, and consist of approximately 40% of Kirwan's share capital.  The sole Class C share is held by Mr. Lynch and consists of .0056% of Kirwan's share capital.

13.      Kirwan's corporate governance is set forth in its charter and a shareholders' agreement among Petitioners, Mr. Lynch, VR Global Partners, Renaissance Holdings

---

[1]     Renaissance and its investor group initially funded Mascini, but Renaissance subsequently sold its interests in 2013 to affiliates of VR Capital and the other member of Renaissance's investor group, Jervis Properties Inc.

6

Management Limited and Kirwan (the "Kirwan SHA").  Kirwan's board of managers currently consists of five managers:  two class A managers selected by Mascini, two class B managers selected by Lapidem, and Mr. Lynch as the Class C manager.  The board can include up to seven members, as Mascini can choose four designees.  For now, however, it has chosen to designate only four.

14.     Under the Kirwan SHA, corporate matters include "Majority Shareholder Reserved Matters," which can be approved by Mascini alone; "Special Majority Shareholder Reserved Matters," which require the consent of Mascini and Lapidem; and "Unanimous Shareholder Reserved Matters," which require the consent of all shareholders, including Mr. Lynch.  The great majority of Kirwan's corporate activities are either Majority Shareholder Reserved Matters or Special Majority Shareholder Reserved Matters that require the approval of one or both of Petitioners, but not Mr. Lynch.

15.     Accordingly, since the 2007 auction, Mr. Lynch has served primarily to address administrative affairs affecting PNS, such as corporate and tax filings.  However, Unanimous Shareholder Reserved Matters requiring all shareholders' approval include a proposed sale or disposition or transfer of control of Yukos Finance (an asset which, unfortunately, PNS has never been able to obtain clear ownership or control over), as well as a decision which would result in Kirwan being placed into liquidation, receivership or administration.  Petitioners believe that settlement of litigation is not a Unanimous Shareholder Reserved Matter, but Mr. Lynch has indicated that he contests this interpretation.

16.     Under the Kirwan SHA, the principal financial right attaching to Mr. Lynch's C share is to receive 10% of any Net Gain (as defined in the SHA) generated by Kirwan, after deducting, *inter alia*, all operating expenses, capital contributions and loans provided to Kirwan

by the Petitioners. Accordingly, Mr. Lynch's right to any remuneration is dependent upon the investment realizing a Net Gain. As described below, Kirwan is (and will be) unable to realize sufficient value from its sole asset, PNS, to generate a Net Gain and, therefore, no amount of money will be due to Mr. Lynch as C shareholder. Mr. Lynch understands this. Mr. Lynch nonetheless has sought to block any attempt to realize value from PNS through a settlement of its claim to title to, or control over, Yukos Finance unless any such settlement yields Mr. Lynch, personally, many tens of millions of dollars.

C.    **Initial Litigation History**

17.    Prior to the successful bid for Yukos Finance in 2007, OAO Rosneft ("Rosneft") (who had acquired most of the earlier-auctioned Yukos Oil assets) and the former shareholders and management of Yukos Oil had been embroiled in disputes over ownership and control of Yukos Finance and its assets. However, neither VR Capital nor Renaissance were interested in investing in extended litigation. They therefore concluded that the only viable approach to the auction of Yukos Finance would be to obtain prior agreements with the litigating parties that would resolve the complex web of legal proceedings that had engulfed the assets.

18.    Accordingly, Mr. Deitz approached representatives of GML Ltd. ("GML"), which was the controlling shareholder of Yukos Oil (representing the "oligarch" group controlling approximately 79% of Yukos Oil shares). Ultimately, Mr. Deitz succeeded in obtaining a letter from GML confirming the terms on which it was prepared to settle its controversies. Separately, Renaissance was able to persuade Rosneft to cooperate as well. Pursuant to these "peace agreements," GML and Rosneft agreed that they would (a) acknowledge the investor consortium's ownership of Yukos Finance, (b) lift their attachments over the Yukos Finance shares, and (c) withdraw all other court actions.

19.     One issue remained unresolved at the time of the auction, however.  Two former managers of Yukos Oil, namely, the former international legal counsel (Mr. David Godfrey) and the former CFO (Mr. Bruce Misamore), maintained certain actions and roles in their own right. Both had been the directors of Yukos Finance at the time of the bankruptcy.  The Yukos Oil receiver, Mr. Rebgun, replaced them with his own nominees during the bankruptcy process.  In 2006, Godfrey and Misamore filed a complaint in the Amsterdam District Court alleging that Mr. Rebgun, notwithstanding his legal standing as receiver, lacked the authority to remove them as directors.   While GML expressed confidence that Godfrey and Misamore would eventually support the agreements, they did not. Instead, Godfrey and Misamore insisted on waiting for the verdict of the Amsterdam District Court, which entailed a challenge to the recognition in the Netherlands of the Russian bankruptcy of Yukos Oil.   Based on GML's expression of confidence, VR Capital and the other investors went forward with the transaction.

20.     However, on October 31, 2007, less than two months after the auction of Yukos Finance and the closing on the Yukos Finance shares, the Amsterdam District Court ruled in favor of Godfrey and Misamore.  The court found that the Yukos Oil bankruptcy violated principles of Dutch "public order" and that as a result, the Yukos Oil receiver had not been empowered to dismiss the directors.  This ruling called into question whether the actions of the receiver in selling Yukos Finance were valid, *i.e.*, it suggested that the receiver's sale of Yukos Finance to PNS was incapable of being recognized.

21.     Needless to say, the October 31, 2007 decision changed the investment thesis dramatically.  The peace agreements collapsed, and the investor consortium was left without an effective remedy against Yukos Oil:  The purchase had been without recourse, and the Yukos Oil

estate had completed its liquidation, distributed all assets to its creditors and, by Russian law, was required to dissolve as a corporate entity within a matter of days.

**D.       The Ensuing Dutch Litigation**

22.      The path of the Dutch litigation since 2007 has been vast and torturous.  PNS, funded entirely by Petitioners (acting through Kirwan), immediately joined as an interested party in the appeal of the October 31, 2007 decision.  That appeal lasted three years.  In 2010, the Amsterdam Court of Appeal ruled against PNS, holding that, due to the absence of a bankruptcy treaty between Russia and the Netherlands, as a matter of private international law, no actions of a Russian receiver could be recognized in the Netherlands.  As a consequence, the court ruled PNS had never validly purchased Yukos Finance.

23.      PNS appealed this decision to the Dutch Supreme Court.  After another three years, in September 2013, the Supreme Court overturned the Court of Appeals and found that, in principle, private international law grounds provided no bar to the recognition of the acts of a Russian receiver in the Netherlands.  It granted the parties leave to request remand of the October 31, 2007 decision to the Court of Appeals so that such court could consider the "public order" grounds which were the subject of the original appeal.  Briefing in the remand is ongoing and the time frame for a final judicial resolution of this matter is uncertain, but reasonably can be stated to be years away.

**E.       The Glendale Case**

24.      The October 31, 2007 decision was not the only legal hurdle that appeared after the Yukos Finance auction.  A company called Glendale Group Ltd. ("Glendale") filed a conservatory attachment over the shares of Yukos Finance in an amount of approximately $3 billion on August 14, 2007, one day prior to the auction.  Glendale is controlled by Godfrey and

Misamore.  The attachment was based on promissory notes allegedly issued by Yukos Oil to Glendale.  Glendale's conservatory attachment over the Yukos Finance shares is structurally senior to PNS's (contested) rights to such shares.  The existence of the Glendale claim was not revealed to the consortium until *after* the date of the auction.

25.      While the Glendale proceedings remained dormant in the Netherlands at first, in late 2008, Godfrey and Misamore filed an action seeking to convert the attachment to an "executory status" and to require a court-ordered auction of Yukos Finance shares.  In the case of such an auction, all proceeds would go to (partially) satisfy the $3 billion Glendale claim.  In such a scenario, the Kirwan consortium's residual ownership interest would be worthless, even were it to succeed in upholding the validity of its purchase of Yukos Finance.

26.      Accordingly, on January 27, 2009, PNS filed a motion to join the Glendale action as an interested party.  PNS filed defenses against Glendale's claims on procedural grounds, arguing that Glendale had deliberately waited to bring its claim against Yukos Oil until after the company had ceased to exist, violating a bar against litigating against a non-existent party.  Some three-plus years later, however, on July 7, 2012, the Amsterdam District Court rejected the procedural grounds for appeal and ordered PNS to fully brief it on substantive grounds.  On January 7, 2013, PNS filed an appeal of the interlocutory decision with the Amsterdam Court of Appeals.

27.      On May 15, 2014, the Court of Appeals rejected PNS's appeal and PNS appealed to the Dutch Supreme Court.  Late last fall, however, on November 13, 2015, the Dutch Supreme Court issued its opinion rejecting PNS's appeal, permitting the Glendale claim to go forward for consideration on the merits.  The Supreme court found that, notwithstanding Yukos Oil having ceased to exist, PNS could be required to stand in its shoes and defend the Glendale claims.  This

decision was unexpected in light of an advisory opinion to the Supreme Court from the Dutch attorney general fully supporting PNS's position.

28.      PNS filed a motion with the Dutch Supreme Court requesting that it reconsider its decision as it was based on novel grounds not argued by its opponents.  The Supreme Court rejected the motion.  As things stand, the Glendale case is back before the Amsterdam District Court on remand with defense papers on the merits of the claim due from PNS on March 23, 2016.  Any decision of the District Court will be appealed.  Accordingly, it is likely that a final, non-appealable verdict may not be rendered for another five years.  While Kirwan intends to cause PNS to vigorously defend these claims on the merits, it has limited access to information surrounding the claims it is required to defend and therefore may not succeed in properly rebutting them.

**F.      Ancillary Proceedings**

29.      In addition to the Dutch litigation, significant related litigation has also arisen in other jurisdictions, including the United States.  Those proceedings include the following:

(a)      PNS appeared in the Yukos Oil-related Chapter 15 proceeding before this Court contesting the modification of this Court's May 2006 order regarding the disposition of claims which impacted the ultimate value of Yukos Finance.  That proceeding generated discovery requests against PNS related to its reliance on the May 2006 order, requiring extensive briefing and multiple appearances before this Court.

(b)      In 2007, Godfrey and Misamore filed a petition pursuant to 28 U.S.C. § 1782 seeking permission to serve subpoenas on a consortium of investors, including VR Capital, Renaissance, Mr. Deitz, and other respondents.    The subpoenas sought documents and

12

depositions from the investors.  Following oral argument, Judge Rakoff issued a decision quashing the subpoenas.

(c)     In 2008, HBK, a co-investor with VR Capital in Lapidem, became embroiled in contested discovery proceedings under 28 U.S.C. §1782 in the United States District Court for the Northern District of Texas requiring extensive briefing and oral argument in Dallas, substantial document discovery, motion practice over assertions of privilege, and a deposition in New York.

(d)     Since 2009, PNS has been involved in a civil action for an accounting against Misamore in Harris County, Texas.  By order dated March 9, 2010, the case was formally stayed.  The stay was confirmed by a subsequent order of the Court dated August 20, 2014.  In 2015, PNS sought to lift the stay and obtain a temporary restraining order against Mr. Misamore. The requested relief was not granted.  The matter continues to be stayed.

(e)     In August 2015, a petition under 28 U.S.C. § 1782 was filed against Mr. Eric Wolf, a representative of the former Yukos shareholders, in the Southern District of New York seeking documents and a deposition.  Judge Koeltl presided over the proceedings and ordered Mr. Wolf to provide deposition testimony on October 5, 2015.

(f)     In October 2015, Mr. Godfrey and certain Yukos-related entities filed a new petition under 28 U.S.C. § 1782 seeking to serve subpoenas which were nearly identical to the subpoenas that Judge Rakoff quashed in 2007.  The 2015 subpoenas sought documents and depositions from VR Capital and Mr. Deitz.  The court held oral argument on whether to require compliance with the new subpoenas in February 2016.  The matter remains pending.

G.     **Efforts At Settlement and Mr. Lynch's Attempts To Thwart Same**

30.     As noted above, the foregoing litigation has lasted eight years and cost Petitioners approximately $35 million.  Thus far, however, Petitioners have been surprised and frustrated at almost every turn in their litigation before the Dutch courts.  PNS's title to the Yukos Finance shares still has not been recognized in the Netherlands.  Currently, Yukos Finance's primary asset is approximately $800 million in cash.  However, if Kirwan is to have any chance of laying claim to any of that value, it must (a) succeed in overturning the October 31, 2007 decision, a result that is not assured and is years away; and (b) succeed in defending against the $3 billion Glendale attachment.

31.     Petitioners face the additional challenge that PNS's opponents have effectively unlimited resources at their disposal -- in the form of the very funds held by Yukos Finance -- via a so-called "Stichting" arrangement[2].  In short, PNS's adversaries are fighting PNS with funds that PNS considers to be its own money (given its purchase of the Yukos Finance shares), while VR Capital has had to contribute its own considerable resources, including by hiring an in-house lawyer to coordinate the litigation.

32.     Moreover, as noted above, in November 2015, the Dutch Supreme Court handed down its decision in the Glendale action.  This decision was adverse to PNS, resulting in a further shift in the parties' relative bargaining strengths.  It is within the context of this painfully protracted and costly litigation that Mr. Godfrey, a board member of the Stichting, made an offer

---

[2]     In connection with the Yukos Oil bankruptcy, Yukos management had undertaken a restructuring of Yukos Finance.  The essence of the restructuring was that all of Yukos Finance's assets had been moved into a subsidiary, Yukos International UK BV ("YIUK") or into subsidiaries of YIUK.  Yukos management had further caused Yukos Finance to contribute all of its shares in YIUK to a Dutch foundation (the "Stichting").  The Stichting board was given all powers over YIUK and Yukos Finance received only the right to any proceeds realized from YIUK.  The structure had clearly been put in place as a "poison pill" defense to frustrate creditors.

to Mr. Deitz and Mr. Lynch to settle all litigation for $60 million on December 18, 2015.  Mr.

Deitz, understanding that the offer provided a basis at least to begin settlement negotiations,

contacted Mr. Lynch about the settlement proposal, explaining that it "warranted a board meeting

of Kirwan so that the board may consider the proposal and decide what, if any, steps should be

taken in response."  However, Mr. Lynch responded with cursory notes that "there is no need for

any board or shareholders meeting".  Worse, he said that he intended to communicate with Mr.

Godfrey directly himself – despite having no legal authority to do so and having been explicitly

instructed by Kirwan not to do so.

33.      Indeed, by the time GML's offer was made in December 2015, Mr. Lynch had

already established a long track record of interfering with settlement discussions to extract value

for himself.  For example, at the October 5, 2015 deposition of Mr. Eric Wolf, a representative of

the former Yukos shareholders, Mr. Wolf testified that Mr. Lynch told him that:

> "he [Mr. Lynch] wouldn't be in favor of a settlement like that [of up to $400
> million] because he would not get paid in a settlement like that because he's only
> paid on the percentage of profit in there, and therefore, he would not get the
> money.  And I said -- I asked him what would his suggestion for the settlement
> and he said that aside from a lump sum payment of 450 to $500 million, he
> doesn't see any possibility of a settlement, and that was it."[3]

34.      Mr. Lynch's attempt to impose his own personal interest into these matters is not

only a derogation of his fiduciary obligations, but it also flies in the face of rulings made by an

arbitrator in recent arbitration proceedings commenced by Mr. Lynch against Petitioners, Kirwan

and VR Capital in 2015.[4]    In that case, the arbitrator considered various corporate governance

disputes raised by Mr. Lynch.    In rejecting the vast bulk of his complaints, the arbitrator

---

[3]    Wolf Depo. Tr. (Oct. 5, 2015) at p. 120.

[4]     ¶ 66, Final Award of Mr. Dunning QC in LCIA Arbitration No. 142774 dated 13 July 2015 (the "Final Award").

considered the evolution of the parties' agreements as to corporate governance.  Starting with the original charter of PNS, executed in 2007 (the "2007 PNS Charter"), the arbitrator held that "[i]t is notable that numerous matters including all important decisions on financial matters and settlements were exclusively reserved to [Kirwan] as the sole member of PNS. … The role of the General Director [Mr. Lynch], apart from day to day management and relatively minor decisions, was essentially limited to the carrying into effect of decisions within the exclusive power of [Kirwan]."

35.     The arbitrator further went on to hold that "the original charter of PNS did not give the General Director power to block transactions, such as the settlement of major litigation related to the assets of PNS, with which he disagreed.  The exclusive power to decide in relation to such matters rested with the sole member [Kirwan], and the General Director was obliged to carry its decisions into effect."[5]

36.     Incredibly, in 2010 Mr. Lynch, without authorization, unilaterally and clandestinely amended the 2007 PNS Charter to strip away from Kirwan a number of the key powers reserved to its sole authority, including the very power to approve the conduct and settlement of litigation.  When his actions were discovered in the course of the 2015 arbitration, Mr. Lynch voluntarily agreed to restore the powers from the 2007 PNS Charter.   As a consequence, a new 2015 PNS charter (the "2015 PNS Charter") now governs the affairs of PNS. Consistent with the original 2007 PNS Charter, the 2015 PNS Charter again reserves to Kirwan sole exclusive authority over decisions approving the participation of PNS in any legal proceedings, "including, inter alia, initiating, settling and withdrawing" any such proceedings.

---

[5]     ¶ 67, Final Award.

37.     Despite this, and less than a month after the arbitrator's final award, Mr. Lynch told Mr. Deitz, "Only I act for the company [PNS].  When there is a decision to be made, I will bring it to [the shareholder].  He continued, "You don't have the authority to tell me not to meet with Yukos[;] [t]here is not going to be a settlement unless I get paid."

38.     This exchange exposes the sheer mendacity of Mr. Lynch's course of conduct. Hiding behind the ceremonial position of PNS General Director (whose powers are limited by the company's charters to administrative matters involving amounts of less than $10,000), Mr. Lynch has attempted to hold Kirwan to ransom.  This callous disregard of fiduciary duty and willful disdain for the black and white text of the arbitrator's final award shows that Mr. Lynch has concluded that, despite being out of the money, he will attempt to destroy whatever value remains of Kirwan unless he is richly paid off.  Mr. Lynch's conduct runs completely counter to how Kirwan was run from its inception and to the arbitrator's ruling.  Moreover, it makes no rational sense that sophisticated investors such as VR Capital, HBK and Jervis, who fronted all the money for this investment and who have exclusively controlled and funded the litigation to date to the tune of $35 million, suddenly should have no ability to resolve that litigation.

39.     After the negative Glendale decision in November 2015, relations with Mr. Lynch deteriorated even further.  Prior to the decision, there had been some prospect for Mr. Lynch to receive a Net Gain.  But after the decision, the prospect for any recovery for Mr. Lynch declined dramatically.  Mr. Lynch therefore greatly intensified his demands and rhetoric.

40.     For example on March 2, 2016, Mr. Wolf told Mr. Deitz and Mr. Sina Toussi, General Counsel for VR Capital, that Mr. Lynch had demanded to be paid *$35 million* before he would agree to settle the PNS case.  This from a man who did not contribute one dime to Kirwan's capital or its litigation costs, and who respectfully does not know the first thing about

17

the merits of the actions.  Moreover, his equity interests sit behind $309 million of acquisition financing and $35 million of litigation loans.  A $60 million settlement would leave Mr. Lynch $275 million under water; a $137 million settlement leaves him $208 million under water. Clearly he has no legal or economic basis for demanding a $35 million pay-out or attempting to hijack settlement negotiations and stand proper governance on its head in order to extort value.

41.    Not wishing to see the prospects of settlement torpedoed by Mr. Lynch for his own selfish purposes, Mr. Deitz engaged (as the arbitrator found he was entitled to do)[6] in settlement discussions to see if a settlement could be salvaged and at more favorable amounts. Those discussions have borne significant fruit: Mr. Deitz has been able to more than double the December 2015 settlement offer of $60 million to $137.5 million.  However, simultaneously with those discussions, Mr. Lynch sent letters to VR Capital, Petitioners and Kirwan demanding that they terminate any and all settlement discussions, coupled with a separate, threatening letter to GML and Mr. Wolf claiming that any litigation settlement which they may conclude over his objections would cause him irreparable harm.

**H.    Petitioners' Proposal For These Cases**

42.    While even a $137.5 million settlement is over $200 million less than total claims against Kirwan and will not pay Petitioners in full, after extensive discussions with Dutch counsel regarding the Dutch proceedings described above, including the possibilities of success or failure, the likely delay caused by further litigation, and the enormous costs incurred to date, Petitioners believe that this settlement is the best available under the circumstances and should be accepted.

---

[6]    ¶ 122, Final Award (rejecting Mr. Lynch's claim that an earlier attempt by Mr. Deitz to explore possible settlement was a breach of the Shareholders' Agreement, the arbitrator held that "In my view, the most logical interpretation is that he [Mr. Deitz] was exploring possible settlement on behalf of [Kirwan], alternatively that he was acting on his own behalf as someone able to control, indirectly, the decisions and actions of [Kirwan]").

18

43.     The Petitioners therefore are prepared to propose a plan and related disclosure statement pursuant to which Petitioners will ensure that all creditors and administrative claimants, other than Petitioners, will be paid in full.  The Plan will embody the means for effectuating a settlement of the global litigation pursuant to 11 U.S.C. § 1123(b)(3) and (4).  The Petitioners will be prepared to show, with the assistance of experts in applicable non-U.S. law, the relative strengths and weaknesses of the proceedings in the Dutch courts.  Petitioners will further show that, based on those relative strengths and weakness, the time value of money, possibilities for yet further delay, and the likely costs of continued litigation, settlement of the litigation is in the best interests of the estate and should be approved.

44.     The plan also will include appropriate releases among the litigants and, significantly, appropriate orders and injunctions barring Mr. Lynch and all other persons from pursuing any litigation against any of the settling parties in any forum on account of any matter connected to the litigation and/or Kirwan.  Proceeds from the settlement will be used to satisfy claims and interests in the strict order of priority.  All stock in Kirwan will be cancelled and its governance structure shall be dissolved.  Petitioners reserve the right to obtain standing to sue Mr. Lynch for damages caused by his breach of fiduciary duties, including the costs of this involuntary case and any related litigation costs.

## ARGUMENT

45.     Except as may be terminated or extended by a court for cause, Bankruptcy Code section 1121 sets the period of time during which a debtor has the exclusive right to file a plan of reorganization and solicit acceptances thereof to 120 and 180 days, respectively. *See* 11 U.S.C. §§ 1121(b), (c).  Although the Bankruptcy Code does not define "cause," bankruptcy courts have great latitude in deciding, on a case-by-case basis, whether to terminate or extend exclusivity.

19

*See, e.g., In re Energy Conversion Devices, Inc.*, No. 12-43166, 2012 WL 2779036, at *2
(Bankr. E.D. Mich. June 11, 2012) (quoting *In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128,
132 (D.N.J. 1995) (interpreting the word "may" in Bankruptcy Code section 1121(d), coupled
with the lack of definition for "cause," to confer upon the bankruptcy court great latitude in
deciding whether to modify a debtor's exclusive period)); *In re Sharon Steel Corp.*, 78 B.R. 762
(Bankr. W.D. Pa. 1987) (same).

46.     Indeed, one of the fundamental purposes of Bankruptcy Code section 1121 is "to
limit the delay that makes creditors the hostages of" the chapter 11 process.  *United Sav. Ass'n of
Tex. v. Timbers of Inwood Forest Assocs., Ltd.* (*In re Timbers of Inwood Forest Assocs., Ltd.*),
808 F.2d 363, 372 (5th Cir. 1987) (characterizing Bankruptcy Code section 1121 as "a
congressional acknowledgement that creditors, whose money is invested in the enterprise no less
than the debtor's, have a right to a say in the future of that enterprise"), *aff'd*, 484 U.S. 365
(1988); *see also Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 102 (3d Cir. 1988)
(discussing legislative history to Bankruptcy Code section 1121(d) and noting that "unlimited
exclusivity gave a debtor 'undue bargaining leverage,' because it could use the threat of delay to
force unfair concessions") (emphasis omitted).

47.     Although courts in this jurisdiction often examine the non-exclusive list of
"*Adelphia factors*"[7] in determining if cause exists to terminate exclusivity, they have also

---

[7]     The *Adelphia* factors include: (1) the size and complexity of the case; (2) the necessity for sufficient time to
permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of
good faith progress toward reorganization; (4) whether the debtor is paying its bills as they become due; (5)
whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has
made progress in negotiations with its creditors; (7) the amount of time that has elapsed in the case; (8) whether
the debtor is using exclusivity in order to pressure creditors to submit to the debtor's reorganization demands;
and (9) whether an unresolved contingency exists. *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586–87
(Bankr. S.D.N.Y. 2006) (citing *Dow Corning*, 208 B.R. at 664 and explaining that while "cause" is not defined
in the Bankruptcy Code, courts have developed a list of factors to inform the inquiry, which have come to be
called the "*Adelphia* factors").

20

recognized that some of the Adelphia factors may be more relevant or important than others based on the facts of each case. *See In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014), *In re Borders Grp., Inc.*, 460 B.R. 818, 827 (Bankr. S.D.N.Y. 2011); *see also Bunch v. Hoffinger Indus., Inc.* (*In re Hoffinger Indus., Inc.*), 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003) (emphasizing that not all of the factors are relevant in each case and that it lies within the discretion of the bankruptcy court to determine which are appropriate in each case); *In re Dow Corning*, 208 B.R. 661, 669 (Bankr. E.D. Mich. 1997) ("[W]hen a court considers a laundry list of factors in the course of deciding a matter, it is not limited to the elementary task of counting the factors. Sometimes one or more factors strongly point to a particular result while others point the other way only weakly. And sometimes certain factors are just more relevant or important than others.").

48.     Moreover, the *Adelphia* court recognized that the case law factors may not be determinative in every case, and that the "primary consideration" for a court in determining whether exclusivity should continue or terminate is whether termination "will move the case forward." *See Adelphia*, 352 B.R. at 590 (quoting *Dow Corning*, 208 B.R. at 670). This amounts to "a practical call that can override a mere toting up of the factors." *Id.*; *see also In re Henry May Newhall Mem'l Hosp.*, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002) ("[A] transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward to a fair and equitable resolution."). In other words, "the test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case. Certainly, practical considerations or other considerations in the interest of justice, could override, in certain cases, the results after analysis of the nine factors." *Adelphia*, 352 B.R. at 590.

21

49.     In the instant case, termination of exclusivity will move the case forward materially.  Mr. Lynch, through his one board seat and .0056% of Kirwan's equity, has managed to stymie the proper functioning of Kirwan's governance structure.  He also has proven that he will not act in the best interests of stakeholders other than himself.  Indeed, he has held these proceedings ransom, attempting to extort $35 million for himself.  Accordingly, Kirwan as an entity likely will not propose its own plan or settle matters itself.  The only way to resolve eight years of global litigation is through a plan that embodies a settlement proposed by the Petitioners, who own 99.9944% of Kirwan and hold over 99% of the debt, and who know the particulars of the litigation better than anyone, including Mr. Lynch.

50.     Conversely, a failure to terminate exclusivity will result not only in these cases languishing unnecessarily – this Court should assume that Mr. Lynch will only hold it up – but maintaining exclusivity will also harm Petitioners.  The Petitioners have the only dog in this fight, not Mr. Lynch.  They're out eight years and hundreds of millions of dollars.  They want to bring these matters to an end now, with the least friction possible.  Maintaining exclusivity, which means giving Mr. Lynch a veto power that he has improperly arrogated to himself, will only reward his breaches of fiduciary duty while the prospects of a settlement wither and Petitioners' litigation costs mount.

51.     In addition to the foregoing, the *Adelphia* factors further warrant termination of exclusivity.  First, Kirwan's capital structure is not especially complex.  There are fewer than 12 creditors, and over 99% of the debt and over 99% of the equity is held by Petitioners.  The only asset is PNS, whose only asset in turn is its claim to Yukos Finance.  That claim is the subject of litigation that, while complicated, can be easily summarized, and the rationale for its settlement simply-stated and justified.  The second *Adelphia* factor is the necessity for sufficient time to

22

permit the debtor to negotiate a plan and prepare adequate information. Here, the plan revolves exclusively around the litigation in the Netherlands, which has spanned many years and has already been the subject of many months of negotiations. Maintenance of exclusivity will not enhance negotiations positions or settlement prospects. In fact, termination of exclusivity will expedite settlement.

52. The third *Adelphia* factor is the existence of good faith progress toward reorganization. Clearly, Mr. Deitz and VR Capital have made significant progress towards settlement, despite Mr. Lynch's efforts to undermine those efforts. So long as Mr. Lynch continues to pervert Kirwan's capital structure by improperly holding Kirwan and settlement discussions hostage, Kirwan cannot itself progress towards reorganization. That can only occur if exclusivity is terminated so Petitioners can pursue settlement. The fourth *Adelphia* factor is whether Kirwan is paying its debts as they come due. Any such debts constitute litigation costs that Petitioners will front; Kirwan itself has no funds and hence, no ability to do so.

53. The fifth *Adelphia* factor is whether the debtor has demonstrated reasonable prospects for filing a plan. Again, so long as Mr. Lynch continues to hijack Kirwan's governance structure, Kirwan will never be able to demonstrate any prospects for filing a plan. A plan can be filed only if exclusivity is terminated so Petitioners can proceed with their settlement. The sixth *Adelphia* factor is whether the debtor has made progress in negotiations with creditors. Again, Kirwan itself has been unable to pursue rational settlement discussions that in turn could form the basis of a distribution for creditors because of Mr. Lynch's recalcitrance. The seventh *Adelphia* factor is the amount of time that has elapsed in the case. None has elapsed here, but four more months of exclusivity will not accomplish anything anyway given Mr. Lynch's entrenchment.

23

54.     The eighth *Adelphia* factor is whether the debtor is using exclusivity in order to pressure creditors to submit to the debtor's reorganization demands.   Kirwan has been incapacitated by Mr. Lynch, so it cannot use exclusivity for any purpose, let alone to pressure creditors.   But maintaining exclusivity will allow Mr. Lynch to attempt to pressure creditors by continuing to hold a gun to everyone's head and run up expenses in derogation of his fiduciary duties.   The final *Adelphia* factor is whether an unresolved contingency exists.   The litigation is a contingency, but one that can be resolved if Petitioners can move forward with their plan.   The contingency will never go way so long as Mr. Lynch remains involved.

55.     In short, Petitioners have demonstrated ample good faith in furtherance of their resolution efforts, while Mr. Lynch has proven himself to be counter-productive.   Exclusivity will only be used by Mr. Lynch to pressure Petitioners and other parties into paying him off, which no one is prepared to do.   Exclusivity should be terminated.

## NOTICE

56.     Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the Debtor; (c) Mr. Stephen Lynch; (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; and (f) any other party entitled to notice pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b).   Petitioners respectfully submit that no other notice is necessary or required.

## NO PRIOR REQUEST

57.     No prior request for the relief requested herein has been made to this or any other Court.

24

## **CONCLUSION**

For the foregoing reasons, the Petitioners respectfully requests that the Court (i)

enter an order terminating the Debtor's exclusive periods and (ii) grant the Petitioners such other

relief as the Court deems just, proper and equitable.

Dated: New York, New York
       March 17, 2016


                              SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP


                              By: */s/ Jay M. Goffman*_____
                                  Jay M. Goffman
                                  Mark A. McDermott
                                  Suzanne Lovett
                                  Four Times Square
                                  New York, New York 10036
                                  (212) 735-3000


                              *Counsel to Petitioning Creditors*

**<u>EXHIBIT A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| KIRWAN OFFICES S.À R.L., | : | Case No. 16-22321 (RDD) |
| | : | |
|       Debtor. | : | |
| | : | |
| | : | |

**ORDER GRANTING THE MOTION OF PETITIONING CREDITORS**
**TO TERMINATE THE DEBTOR'S EXCLUSIVITY PERIODS**

Upon the motion (the "Motion") of Lapidem Ltd. ("Lapidem") and Mascini

Holdings Limited ("Mascini" and together with Lapidem, the "Petitioners") for an order,

pursuant to section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code"),

terminating the exclusive plan filing and solicitation periods (the "Exclusive Periods") of Kirwan

S.à r.l. ("Kirwan" or the "Debtor"); this Court finds and concludes that the Court has jurisdiction

over the subject matter of the Motion and the relief requested therein pursuant to 28 U.S.C. §§

157 and 1334; this is a core proceeding pursuant to 28 U.S.C. § 157(b); the legal and factual

bases set forth in the Motion and on the record at the hearing establish just cause for the relief

granted herein; the relief requested in the Motion is in the best interests of the Debtor, its estate

and its creditors; notice of the Motion was sufficient, and no other or further notice need be

provided; and after due deliberation and sufficient cause appearing therefor, it is HEREBY

ORDERED that:

1.      The Motion is granted to the extent set forth herein.

2.      Pursuant to Bankruptcy Code section 1121(d), the Debtor's Exclusive Periods are

hereby terminated. Any party in interest may file and solicit a plan of reorganization for the

Debtor.

3.      The terms and conditions of this order shall be immediately effective and

enforceable upon its entry.

4.      The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this order.

Dated: _____, 2016
New York, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY
JUDGE