SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Suzanne Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioning Creditors, Lapidem Ltd. and Mascini Holdings Limited*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **KIRWAN OFFICES S.À R.L.,** | : | **Case No. 16-22321 (RDD)** |
| | : | |
| **Debtor.** | : | **Involuntary Petition Pending** |
| | : | |

## OBJECTION AND MEMORANDUM OF PETITIONING CREDITORS, LAPIDEM LTD. AND MASCINI HOLDINGS LIMITED, TO MOTION AND MEMORANDUM OF LAW OF STEPHEN LYNCH FOR <u>INTERVENTION AND DISMISSAL, ABSTENTION OR STAY</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................2

BACKGROUND ....................................................................................................................6
    A.    Overview of Yukos Finance Purchase And Subsequent Global
        Litigation.......................................................................................................6
    B.    Mr. Lynch's Breach Of His Fiduciary Duties And The Arbitrator's
        Rulings ..........................................................................................................8
    C.    The Petitioners' Proposal For These Cases ..........................................11

ARGUMENT........................................................................................................................14
    A.    This Court Should Not Dismiss, Abstain From, Or Stay This
        Chapter 11 Case In Favor of Arbitration .............................................14
    B.    Mr. Lynch Should Not Be Allowed To Intervene On Kirwan's
        Behalf..........................................................................................................23
    C.    The Involuntary Filing Is Proper, And An Order For Relief Should
        Be Entered .................................................................................................26
    D.    Neither Abstention Nor Dismissal Under §§ 305 and 1112 Of The
        Bankruptcy Code Is Warranted .............................................................39

NOTICE..............................................................................................................................44

CONCLUSION.....................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*In re 68 West 127 Street, LLC*,
    285 B.R. 838 (Bankr. S.D.N.Y. 2002)................................................................39, 40

*In re Aerovias Nacionales de Colombia S.A. Avianca*,
    303 B.R. 1 (Bankr. S.D.N.Y. 2003)..................................................................14, 37

*Alfadda v. Fenn*,
    159 F.3d 41 (2d Cir. 1998) ...................................................................................18

*In re American Globus Corp.*,
    195 B.R. 263 (Bankr. S.D.N.Y. 1996)....................................................................34

*C-TC 9th Avenue Partnership v. Norton Co. (In re C–TC 9th Avenue
    Partnership)*,
    113 F.3d 1304 (2d Cir. 1997) ................................................................................38

*In re Ceiling Fan Distributor, Inc.*,
    37 B.R. 701 (Bankr. M.D. La. 1983)......................................................................22

*In re Century/ML Cable Venture*,
    294 B.R. 9 (Bankr. S.D.N.Y. 2003)........................................................................39

*Cohen v. KB Mezzanine Fund II LP (In re SubMicronSystems Corp.)*,
    432 F.3d 448 (3d Cir. 2006) .................................................................................28

*In re Colon*,
    474 B.R. 330 (Bankr. D. P.R. 2012)......................................................................25

*In re Corino*,
    191 B.R. 283 (Bankr. N.D.N.Y. 1995)...................................................................37

*In re CorrLine International, LLC*,
    516 B.R. 106 (Bankr. S.D. Tex. 2014) ..................................................................25

*Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy
    Co.)*,
    226 F.3d 160 (2d Cir. 2000) ................................................................................19

*In re D&F Meat Corp.*,
    68 B.R. 39 (Bankr. S.D.N.Y. 1986)........................................................................39

*Davis v. M&M Developer, LLC (In re MBM Entertainment, LLC)*,
    531 B.R. 363 (Bankr. S.D.N.Y. 2015)....................................................................38

*Eastman v. Eastman (In re Eastman),*
    188 B.R. 621 (B.A.P. 9th Cir. 1995) ........................................................................37

*Garza v. Marine Transport Lines, Inc.,*
    861 F.2d 23 (2d Cir. 1988) ........................................................................16

*In re General Growth Properties, Inc.,*
    409 B.R. 43 (Bankr. S.D.N.Y. 2009)........................................................................38

*In re Godfrey,*
    526 F. Supp. 2d 417 (S.D.N.Y. 2007) ........................................................................27

*In re Hostess Brands,*
    No. 12-22052-rdd, 2013 WL 82914 (Bankr. S.D.N.Y. Jan. 7, 2013)................................20

*In re Houston Regional Sports Network L.P.,*
    505 B.R. 468 (Bankr. S.D. Tex. 2014) ........................................................34, 35

*Iragorri v. United Technoloties Corp.,*
    274 F.3d 65 (2d Cir. 2001) ........................................................................18

*JWL Entertainment Group, Inc. v. Solby & Westbrae Partners (In re Fisher
Island Investments, Inc.),*
    778 F.3d 1172 (11th Cir. 2015) ........................................................................17

*In re Kingston Square Associates,*
    214 B.R. 713 (Bankr. S.D.N.Y. 1997)........................................................6, 34, 39

*Klein v. Nu-Way Shoe Co.,*
    136 F.2d 986 (2d Cir. 1943) ........................................................................23

*Kukuda v. Westport Insurance Corp. (In re Michael Angelo Corry Inn. Inc.),*
    No. 01-11201, 2002 WL 400780 (Bankr. W.D. Pa. Jan. 8, 2002), *rev'd on
other grounds, Estate of Inn v. Vega,* 53 F. App'x 205 (3d Cir. 2002)................23

*In re Leman Bros. Holdings Inc.,*
    No. 14 Civ. 7643(ER), 2015 WL 5729645 (S.D.N.Y. Sept. 30, 2015) ................19, 21

*Management Technologies, Inc. v. Morris,*
    961 F. Supp. 640 (S.D.N.Y. 1997) ........................................................................34

*Martinez v. Bloomberg LP,*
    740 F.3d 211 (2d Cir. 2014) ........................................................................17, 18

*MBNA America Bank, N.A. v. Hill,*
    436 F.3d 104 (2d Cir. 2006) ........................................................................17, 20, 21

*In re Monitor Single Lift I, Ltd.*,
    381 B.R. 455 (Bankr. S.D.N.Y. 2008)..................................................................37

*In re Murray*,
    543 B.R. 484 (Bankr. S.D.N.Y. 2016)................................................................39

*In re Oakland Popcorn Supply, Inc.*,
    213 F. Supp. 665 (N.D. Cal. 1963)............................................................22, 23

*In re Octaviar Administration Pty Ltd.*,
    511 B.R. 361 (Bankr. S.D.N.Y. 2014)...............................................................25

*In re Paper I Partners, L.P.*,
    283 B.R. 661 (Bankr. S.D.N.Y. 2002)...........................................................36, 38

*In re Persico Contracting & Trucking, Inc.*,
    No. 10-22736 (RDD), 2010 WL 3766555 (Bankr. S.D.N.Y. Aug. 20,
    2010).........................................................................................................37, 38

*In re Petition of Eduard K. Rebgun, as Interim Receiver of Yukos Oil Co.*,
    No. 06-10775 (RDD).......................................................................................15

*Phillips v. Congelton, L.L.C. (In re White Mountain Mining, LLC)*,
    403 F.3d 164 (4th Cir. 2005).........................................................................21

*PNC Bank, National Ass'n v. Park Forest Development Corp. (In re Park Forest
    Development Corp.)*,
    197 B.R. 388 (Bankr. N.D. Ga. 1996)..............................................................39

*In re Quad-C Funding LLC*,
    496 B.R. 135 (Bankr. S.D.N.Y. 2013).........................................................35, 36

*In re RCM Global Long Term Capital Appreciate Fund, Ltd.*,
    200 B.R. 514 (Bankr. S.D.N.Y. 2009)...............................................................40

*In re Sletteland*,
    260 B.R. 657 (Bankr. S.D.N.Y. 2001)...............................................................39

*In re Syndicom Corp.*,
    268 B.R. 26 (Bankr. S.D.N.Y. 2001)................................................................39

*United States Lines, Inc. v. American Steamship Owners Mutual Protection &
    Indemnity Ass'n (In re United States Lines, Inc.)*,
    197 F.3d 631 (2d Cir. 1999)......................................................................19, 20

*Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)*,
    544 B.R. 75 (Bankr. S.D.N.Y. 2016)................................................................29

*In re Westerleigh Development Corp.*,
    141 B.R. 38 (Bankr. S.D.N.Y. 1992) .................................................................22, 23

*Wight v Eckhardt Marine GmbH*
    [2003] UKPC 37, [2004] 1 AC 147 .............................................................................16

*In re Xacur*,
    219 B.R. 956 (Bankr. S.D. Tex. 1998) .......................................................................13

*In re Yukos Oil Co.*,
    321 B.R. 396 (Bankr. S.D. Tex. 2005) .................................................................14, 25

## STATUTES

11 U.S.C. § 109(a) ...........................................................................................................28

11 U.S.C. § 303(d) ...........................................................................................................22

28 U.S.C. § 1334(a) .........................................................................................................13

28 U.S.C. § 157(b)(2)(L) .................................................................................................20

## RULES

Fed. R. Bankr. P. 1011(b) ...............................................................................................21

## OTHER AUTHORITIES

2 *Collier On Bankruptcy* ¶ 305.02 (Alan N. Resnick & Henry J. Sommer eds.,
    16th ed. 2016) ................................................................................22, 25, 36, 37

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Suzanne Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioning Creditors, Lapidem Ltd. and Mascini Holdings Limited*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **KIRWAN OFFICES S.À R.L.,** | : | **Case No. 16-22321 (RDD)** |
| | : | |
| Debtor. | : | **Involuntary Petition Pending** |
| | : | |

### OBJECTION AND MEMORANDUM OF PETITIONING
### CREDITORS, LAPIDEM LTD. AND MASCINI HOLDINGS LIMITED,
### TO MOTION AND MEMORANDUM OF LAW OF STEPHEN LYNCH FOR
### INTERVENTION AND DISMISSAL, ABSTENTION OR STAY

Lapidem Ltd. ("Lapidem") and Mascini Holdings Limited ("Mascini," and together with Lapidem, the "Petitioners"), the largest unsecured creditors of Kirwan Offices S.à r.l. ("Kirwan" or the "Debtor"), by and through their undersigned counsel, respectfully submit this objection and memorandum in response to the motion and memorandum of Stephen Lynch ("Mr. Lynch") seeking to intervene in these proceedings on Kirwan's behalf, and seeking dismissal, abstention or a stay of these proceedings pursuant to §§ 305 and 1112 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). In support of this objection and memorandum, the Petitioners have filed concurrently herewith (i) the Declaration of Richard Andrew Deitz, President of VR Capital Group, Ltd. (the "Deitz Decl."); (ii) the Declaration of Martin

Pascoe QC, an English barrister and expert in English law (the "Pascoe Decl."); and (iii) the Declaration of Paul Mousel, a member of the Luxembourg bar and expert in Luxembourg law (the "Mousel Decl."). As and for their objection and memorandum, the Petitioners respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As this Court is well aware, discharging insolvent debtors and maximizing value that can be returned to creditors are purposes that lie at the heart of the bankruptcy process.  A bankruptcy court is granted wide legal and equitable powers to ensure that from a collective view, consistent with affected-party priorities, seemingly intractable and endlessly contestable claims are fairly and efficiently administered.  Notably, creditors— both secured and unsecured—are expressly prioritized.  Only pursuant to certain scrutinized criteria—e.g. a new value plan, etc.—designed to ensure these core purposes, can equity holders be compensated.

2.      This petition presents the poster child for a case requiring application of these principles and meriting this Court's attention.  As set forth in the petition and the Motion to Terminate Exclusivity, Petitioners Lapidem and Mascini are the Debtor's two largest creditors.   Together they are owed approximately $345 million, representing roughly 99% of Kirwan's outstanding debt.  Kirwan is insolvent.  It cannot repay this debt, cannot fund its current liabilities or ongoing expenses, and has no access to further capital absent further injections from the Petitioners.

3.      The reason for this is simple:  Kirwan is not an operating company and generates no cash. It holds one asset—100% of PNS.  PNS, in turn, also holds one asset—a claim to shares in the Dutch entity, Yukos Finance B.V. ("Yukos Finance").  But

2

PNS's right to ownership of those shares has been aggressively and successfully challenged in the Netherlands. Although the extant ruling is on appeal, the Dutch court has held that the Russian bankruptcy process through which Kirwan indirectly purchased its shares failed to comply with Dutch law as a matter of public policy. Thus, plaintiffs in that case, a former director and certain former shareholders of Yukos Finance, have made any realization of value from this asset ████████████

4.    The PNS litigation has been ongoing for approximately eight years in multiple jurisdictions. In an effort to obtain any realization on its loans, the Petitioners lent approximately $35 million to Kirwan to fund the ongoing litigation on top of the hundreds of millions of dollars loaned to Kirwan to acquire the shares of Yukos Finance initially. Kirwan has spent those funds. The Petitioners are unwilling to advance further funds to Kirwan in the absence of having the unambiguous right to settle the litigation.

5.    Recognizing the high continuing cost and uncertainty of the eventual litigation outcome, the plaintiffs in the Dutch action—following significant negotiation— have offered PNS $137.5 million to settle the case. As sole equity holder, Kirwan controls PNS and its ability to agree to any settlement. The Petitioners here, holders of over 99% of Kirwan's debt and over 99% of Kirwan's equity, would like Kirwan to move forward with this proposal. Notwithstanding the loss on the loan they would have to bear, the Petitioners' assessment is that ██████████████████████ ████████████████████ The Petitioners plan to propose a plan that implements this settlement and repays all creditors (other than themselves) in full.

6.    One individual is attempting to block this global resolution of eight years of litigation, which has spawned suits in the United Kingdom and certain jurisdictions in

3

the United States: Mr. Lynch, a shareholder of the Debtor. Mr. Lynch owns less than 1/100[th] of a percent of the Debtor's shares. The Petitioners own the remaining 99.9944%. Mr. Lynch is not a creditor of the Debtor. He has not loaned a penny to Kirwan, including with respect to its eight years of litigation.

7.      Mr. Lynch is in reality a contingent equity holder of the Debtor, whose single share gives him a right to 10% of any net gain achieved by the Debtor from its investment in Yukos Finance. Not surprisingly, there can be a net gain only after payment of the creditors and, expressly, payment of the Petitioners' loans as well as payment of equity amounts invested by the Petitioners as equity holders. Mr. Lynch realizes he is hopelessly out of the money, and endeavors to force the Petitioners to continue to fund the sprawling litigation in hopes of pulling a rabbit out of the hat or, in the alternative, to extort a $35 million ransom payment from the Petitioners for his acquiescence to a settlement.

8.      Thus, in violation of his fiduciary duties as a director of Kirwan, and in an effort to hijack this case, Mr. Lynch offers a panoply of obfuscatory and meritless claims, all with one purpose — to prevent this Court from administering an efficient global settlement discharging Kirwan's debts and maximizing the value for creditors. He refuses to settle, but offers no higher or better alternatives. He demands that the PNS litigation continue, but makes no offer to fund the costs of further litigation.

9.      Mr. Lynch suggests that he is entitled to arbitrate certain disputes he may have with the other Kirwan shareholders under a shareholders' agreement among the parties (the "SHA"). But as the Pascoe Declaration makes clear, the arbitration clause in the SHA, which is governed by English law, covers disputes between the parties as

4

*shareholders*, not a party's exercise of rights as a *creditor*. As the Pascoe Declaration also makes clear, under English law, a creditor's pursuit of a collective remedy like insolvency is not arbitrable. The same is true under U.S. law. Indeed, no arbitrator has the power to effectuate the aim of this chapter 11 case: implementation of a settlement over the dissent of one or more of the parties.

10.     Thus, whatever else can be said, no arbitrable forum can impose the collective remedy required by this case. Without this forum to approve a settlement that affords global peace for all the litigants and binds hold-outs, Mr. Lynch hopes to be able to conscript the Petitioners, who incurred all the sunk costs and have all the economic exposure, into either (i) rolling the dice in continuing the litigation (at the Petitioners' sole expense) in the hope his lucky number might come up; (ii) buying Mr. Lynch off—whose ransom demand is $35 million; or (iii) walking away, with a complete loss of value to all creditors.

11.     Cases in this Circuit are clear. Bankruptcy courts should not order parties to arbitrate substantially core proceedings if doing so inherently conflicts with or would necessarily jeopardize the aims of the Bankruptcy Code. Global settlement of cross-border litigation pursuant to a bankruptcy plan is a substantially core bankruptcy function. Dismissal of this case in favor of an arbitrator who is powerless to effectuate such a settlement inherently conflicts with that outcome, needlessly jeopardizing one of the fundamental bankruptcy policies in favor of settlements. Allowing an out-of-the-money, contingent equity holder like Mr. Lynch, with no economic exposure, to try to use arbitration in derogation of the priorities established by the SHA and his fiduciary

duties, jeopardizing a nine-figure settlement, also inherently conflicts with the policies of the Bankruptcy Code.

12.     Indeed, allowing a renegade director of the Debtor, with fiduciary duties to the corporation and all stakeholders—not just himself—to gamble at the expense of stakeholders with higher priority inherently conflicts with the policies of the Bankruptcy Code. Mr. Lynch should not be permitted to stand on corporate or other formalities to defeat those same stakeholders after they have been forced, by his fiduciary breaches, to pursue the rights left to them—the filing of an involuntary petition. *See In re Kingston Square Assocs.*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997) (declining to dismiss involuntary petition where stakeholders had no other option for protecting value in light of ill-informed director's abdication of his fiduciary duties and hold-out tactics that defeated stakeholders' efforts to achieve an out-of-court solution).

13.     In short, this situation cries out for supervision by a U.S. bankruptcy court with the power to issue orders resolving global litigation that will bind all parties around the world. Mr. Lynch's motion is without merit, and should be denied.

## BACKGROUND

**A.     Overview of Yukos Finance Purchase
        And Subsequent Global Litigation**

14.     Certain of the basic facts are not in dispute. Many of them are summarized in detail in the Petitioners' motion to terminate Kirwan's exclusivity period filed concurrently with the involuntary petition. For ease of reference, a more abbreviated summary of the facts is provided herein.

15.     Kirwan's only asset is a Russian subsidiary, OOO Promneftstroy ("PNS"). Kirwan owns 100% of PNS's equity. In 2007, the Petitioners and certain other parties

6

came together to make an investment through Kirwan and PNS: the acquisition of 100% of the shares of Yukos Finance in an auction by the bankruptcy estate of its parent company, OAO Yukos Oil Company ("Yukos Oil"). On August 15, 2007, PNS won the auction with a bid of $309 million. The Petitioners, whose current majority shareholders are VR Capital Group, Ltd. (together with its subsidiaries, "VR Capital") and its affiliates, funded the entire purchase price through loans to Kirwan. Kirwan in turn loaned the proceeds on to PNS. Those loans remain unpaid.

16.    Following the auction, PNS quickly and unexpectedly became embroiled in litigation with entities connected to the former shareholders and management of Yukos Oil. The former shareholders and management challenged recognition in the Netherlands courts of the Yukos Oil bankruptcy proceedings and the sale of Yukos Finance to PNS by the court-appointed receiver of the Yukos Oil estate. The former Yukos Oil shareholders and management also sought to enforce attachments over the Yukos Finance shares with respect to asserted claims totaling several billion dollars.

17.    Over the ensuing years, related highly complex litigation has been filed in the Netherlands, the United Kingdom and several courts in the United States, including in New York City and Texas. The litigation has lasted over eight years. The defense of PNS has been funded exclusively by the Petitioners in the aggregate amount of over $35 million in the form of additional loans to Kirwan that also remain unpaid. Under the shareholders' original agreement, the Petitioners' funding obligation was capped at $10 million. To this day, PNS still has not succeeded in acquiring clear title to the shares of Yukos Finance. Indeed, a Dutch court has rejected Kirwan's claim to title.

18.     PNS's litigation adversaries have recently made an offer to finally and fully settle this litigation for an amount equal to approximately $137.5 million. The Petitioners believe that it is in Kirwan's best interest to accept this offer. While the offer is far less than the debts that Kirwan owes, the Petitioners believe that, ███████ ███████████████████████████████████████████████████████ ███████████████████████████████████ resolution of the litigation for the settlement amount is in Kirwan's and its stakeholders' best interests and therefore should be accepted and implemented.

**B.     Mr. Lynch's Breach Of His Fiduciary
Duties And The Arbitrator's Rulings**

19.     There is, however, a holdout: Stephen Lynch. Mr. Lynch is a United States citizen who has appeared before this Court in proceedings involving Yukos Oil and Yukos Finance. Mr. Lynch played a limited role in facilitating the original acquisition of Yukos Finance. For his efforts, Mr. Lynch was given a single share representing .0056% of Kirwan's equity. He also received one of seven seats on Kirwan's board, the right to nominate himself as the sole general director of PNS (whose role and responsibilities may be restricted in any way consistent with the SHA that Kirwan, as the sole shareholder, so determines), and the potential to receive 10% of any net gain on the investment after deducting all operating expenses, capital contributions and loans provided to Kirwan by the Petitioners. Mr. Lynch paid nothing for these interests and never contributed to the acquisition of Yukos Finance or the costs necessary to fund the litigation.[1] The Petitioners funded every cent.

---

[1]     Mr. Lynch suggests in his papers that he has incurred costs in connection with the litigation. This is the first the Petitioners have ever heard of this allegation. All costs of litigation since inception have
*(cont'd)*

8

20.     Despite the fact that Mr. Lynch has no skin in the game; that Kirwan is insolvent; and that the Petitioners, as the largest creditors and sole ligation funders, believe that the $137.5 million offer is in the best interests of the estate under the circumstances, Mr. Lynch has actively interfered with settlement efforts in order to obtain a payday for himself.

21.     In his motion, Mr. Lynch argues that he, as the general director of PNS, has sole authority to control the litigation.  He took the same position in the pre-petition arbitration *and lost* on that very issue.  As the arbitrator determined, control over the litigation is vested exclusively in Kirwan, *not* Mr. Lynch.

22.     Moreover, the arbitrator held with respect to PNS' original 2007 charter (which the current version substantially mirrors):  "all important decisions on financial matters and settlements were exclusively reserved to [Kirwan] as the sole member of PNS. . . . The role of the General Director [Mr. Lynch], apart from day to day management and relatively minor decisions, was essentially limited to the carrying into effect of decisions within the exclusive power of [Kirwan]."  The arbitrator further held that "the original charter of PNS did not give the General Director power to block transactions, such as the settlement of major litigation related to the assets of PNS, with which he disagreed.  The exclusive power to decide in relation to such matters rested with the sole member [Kirwan], and the General Director was obliged to carry its decisions into effect."[2]  Consistent with the foregoing, the arbitrator concluded that Mr. Richard

_____

*(cont'd from previous page)*
    been funded by the Petitioners.  Mr. Lynch also seems to suggest that he was responsible for funding PNS with an initial $60 million necessary for it to bid for Yukos Finance.  That is simply untrue.  Mr. Lynch never funded any amount necessary to acquire Yukos Finance.

[2]    Declaration of Stephen Lynch ("Lynch Decl."), Ex. D. ¶ 67.

9

Deitz of VR Capital is authorized to explore possible settlement with the parties' adversaries in the litigation.[3] Mr. Lynch omits these critical facts in his motion and declaration.[4]

23.    Despite these rulings, and less than a month after the arbitrator's final award, Mr. Lynch told Mr. Deitz, "Only I act for the company [PNS].  When there is a decision to be made, I will bring it to [the shareholder]."[5] He continued, "You don't have the authority to tell me not to meet with Yukos[;] *[t]here is not going to be a settlement unless I get paid*."  Moreover, on March 2, 2016, Mr. Deitz learned from one of his litigation adversaries, with whom he was attempting to settle, that Mr. Lynch had demanded to be paid $35 million before he would agree to settle the PNS case.  Mr. Lynch made this demand despite the fact that his 10% equity interest sits behind $309 million of acquisition financing and $35 million of litigation loans.  Mr. Lynch himself has confirmed his demand for $35 million.[6]  Clearly, Mr. Lynch has no legal or economic basis for demanding a $35 million pay-out or attempting to kidnap settlement negotiations in order to extort value for himself when senior stakeholders will not be paid in full.

24.    Not wishing to see the prospects of settlement torpedoed by Mr. Lynch for his own selfish purposes, Mr. Deitz engaged — as the arbitrator found he was entitled to

---

[3]    Lynch Decl., ¶¶ 122-26.

[4]    Incredibly, in 2010 Mr. Lynch, without authorization, unilaterally and clandestinely amended the 2007 PNS charter to strip away from Kirwan a number of the key powers reserved to its sole authority, including the power to approve the conduct and settlement of litigation.  When his actions were discovered in the course of the 2015 arbitration, Mr. Lynch voluntarily agreed to restore the powers from the 2007 PNS charter.

[5]    Deitz Decl. ¶ 32.

[6]    Lynch Decl. ¶ 97.

do — in settlement discussions to see if a settlement could be salvaged and at more favorable amounts. Those discussions have borne significant fruit: Mr. Deitz has been able to more than double an initial settlement offer of $60 million to $137.5 million. However, simultaneously with those discussions, Mr. Lynch sent letters to VR Capital, the Petitioners and Kirwan demanding that they terminate any and all settlement discussions, coupled with a separate, threatening letter to the litigation adversaries, claiming that any litigation settlement which they may conclude over his objections would cause him irreparable harm.[7]

## C.   **The Petitioners' Proposal For These Cases**

25.   It is time to bring the litigation to an end. It is necessary to do so in a forum with the power to bind all parties. Further arbitration would be useless: it would be limited only to addressing intractable governance and collateral disputes. And, in any event, Mr. Lynch seems to ignore the arbitrator's rulings that do not suit him. Accordingly, while a $137.5 million settlement is over $200 million less than the Petitioners' total claims against Kirwan, the Petitioners are prepared to propose a plan that implements the settlement and pursuant to which the Petitioners will ensure that all creditors and administrative claimants, other than the Petitioners, will be paid in full.

26.   At the appropriate juncture, the Petitioners will show, with the assistance of experts in applicable non-U.S. law, the relative strengths and weaknesses of the litigation. The Petitioners will further show that, based on those relative strengths and weakness, ███████████████████████████████████

---

[7]   Deitz Decl. ¶ 33.

11

███████████████ settlement of the litigation is in the best interests of the estate and should be approved.

27.    In an effort to deflect the Court's attention, Mr. Lynch refuses to focus on these core issues, i.e., how best to bring this costly and ███████████ litigation to a rational conclusion. ████████████████████████████████████████ ████████████████████████████████████ From that (factually inaccurate) launch point, Mr. Lynch makes the untenable suggestion that the Petitioners somehow are bound to fund litigation without end unless Mr. Lynch says otherwise.

28.    Not only does Mr. Lynch's claim rest on erroneous purported facts, but nowhere in the SHA does Mr. Lynch have the right to direct the Petitioners to loan additional funds toward litigation.    The Petitioners bid for Yukos Finance on the understanding that they had bought peace with the former shareholders and management of Yukos Finance.    The Petitioners and Mr. Lynch were surprised at the subsequent litigation and its extent.    It was not what anyone anticipated or bargained for.    The Petitioners nonetheless advanced $35 million to protect their investment, but the Petitioners have arrived at the point where enough is enough.    And there is no provision of the SHA that allows Mr. Lynch to force the Petitioners to loan additional funds to Kirwan without limit.

29.    Mr. Lynch's only other argument is that the Petitioners somehow orchestrated Kirwan's insolvency so they could call their loans due.    In fact, he devotes the majority of his brief to a picayune analysis of selected professional fee invoices and alleged disputes about whether certain expenditures were authorized under the SHA. These matters are a complete and utter sideshow.    By any rational measure, Kirwan is

grossly insolvent. The few professional invoices and retainers on which Mr. Lynch focuses were all funded by the Petitioners, and more important, are entirely irrelevant to this fundamental reality—Kirwan is insolvent, Mr. Lynch cannot fund Kirwan and he cannot compel the Petitioners to fund indefinitely subject to his command.

30.    In light of Mr. Lynch's demonstrated penchant to litigate these matters for his own personal benefit, and not that of Kirwan or its other stakeholders, among other things, the Petitioners' proposed chapter 11 plan will include releases among the litigants and, significantly, appropriate orders and injunctions barring Mr. Lynch and all other persons from pursuing any litigation against any of the settling parties in any forum on account of any matter connected to the litigation and/or Kirwan. Proceeds from the settlement will be used to satisfy claims and interests in the strict order of priority and in accordance with the SHA, which subordinates Mr. Lynch's 10% to the Petitioners' claims and interests. All stock in Kirwan will be cancelled and its governance structure shall be dissolved. The Petitioners reserve the right to obtain standing to sue Mr. Lynch for damages caused by his breach of fiduciary duties, including the costs of this involuntary case and any related litigation.

*    *    *

31.    This Court's prompt and continued administration of this case is critical to achieving a global resolution and advancing the goals of the Bankruptcy Code. Mr. Lynch advances several arguments in his efforts to derail the bankruptcy from proceeding: (i) *forum non conveniens*; (ii) the eligibility requirements of section 109 of the Bankruptcy Code; (iii) abstention pursuant to section 305(a)(1); and (iv) dismissal pursuant to section 1112. But analysis of each demonstrates their legal and equitable

13

defects. The Petitioners were driven to pursue this involuntary filing by Mr. Lynch's

improper and irresponsible conduct.

## ARGUMENT

### A.    This Court Should Not Dismiss, Abstain From, Or Stay This Chapter 11 Case In Favor of Arbitration

32.    Mr. Lynch first argues that the involuntary petition should be dismissed

under the doctrine of *forum non conveniens*. In doing so, he relies on a clause in the

parties' SHA and claims that it constitutes a forum selection clause applicable to this

matter that requires shareholder disputes to be arbitrated in London. Mr. Lynch's

argument is without merit, and his request for dismissal, abstention or a stay should be

denied.

### 1.    The Doctrine Of *Forum Non Conveniens* Is Inapplicable To A Chapter 11 Case

33.    The doctrine of *forum non conveniens* and arbitration clauses may be

relied on to dismiss an adversary proceeding or other discrete matter that arises *within* a

chapter 11 case, but Mr. Lynch never explains how they can displace an *entire*

bankruptcy case. He does not and cannot dispute that bankruptcy courts have *exclusive*

jurisdiction over bankruptcy cases. 28 U.S.C. § 1334(a). The only case that intimates

otherwise, in derogation of the plain language of 28 U.S.C. § 1334(a), did so in dictum.

*In re Xacur*, 219 B.R. 956 (Bankr. S.D. Tex. 1998) (dismissing case for lack of personal

jurisdiction).

34.    However, the same court later ruled that *forum non conveniens* is *not* a

proper doctrine for dismissing an entire chapter 11 case. *In re Yukos Oil Co.*, 321 B.R.

396, 408 (Bankr. S.D. Tex. 2005). This holding has particular force where, as here, there

14

are non-parties to the arbitration provision whose rights are at issue. Moreover, none of the other *forum non conveniens* cases that Mr. Lynch cites are bankruptcy cases, and no other bankruptcy court has addressed the issue in the context of a chapter 11 case as a whole. That is not surprising given bankruptcy courts' exclusive jurisdiction over bankruptcy cases. Indeed, loan documents, indentures and other credit agreements customarily contain forum selection clauses. If those clauses were enforceable in bankruptcy, no bankruptcy case could ever go forward. *See generally In re Aerovias Nacionales de Colom. S.A. Avianca*, 303 B.R. 1, 11-12 (Bankr. S.D.N.Y. 2003) (finding that even if a non-U.S. entity files an insolvency proceeding in its "home court," such proceeding would afford no basis for justifying suspension or dismissal of a U.S. bankruptcy case).

35.    Mr. Lynch also cannot credibly suggest that this Court is an inconvenient forum for the resolution of the parties' disputes. Both Mr. Lynch and Mr. Deitz are U.S. citizens. Affiliates of VR Global, including employees responsible for this matter, work in Manhattan. VR Global's investors are mostly U.S. pensioners, charitable foundations and endowment funds. VR Global's co-investor in Petitioner Lapidem, HBK Investments, Ltd., is based in Dallas and manages assets on behalf of similar U.S. beneficiaries. It also has a Manhattan-based sub-advisor.

36.    Certain aspects of the litigation over Yukos Finance have played out in Texas and the Southern District of New York. One of PNS's law firms has possession of certain of PNS's assets in West Virginia, and recently filed an interpleader action naming both Mr. Lynch and Mr. Deitz in connection with disposition of the assets.[8] This Court

---

[8]    Complaint, *Bailey Glasser, LLP v. OOO Promneftstroy*, No. 16-C-588 (W. Va., Apr. 18, 2016).

presided over the chapter 15 proceedings of Yukos Oil, and entered an order in such proceedings relating to the disposition of certain assets of Yukos Finance.[9] Mr. Lynch appeared before this Court in those proceedings to defend that order from the request of certain other parties seeking to vacate it.

37.     In short, neither the facts nor the law warrant dismissal of this case under the doctrine of *forum non conveniens*.

### 2.     The Arbitration Clause Does Not Apply To The Exercise Of Creditors' Rights

38.     There is little question that the arbitration clause in the SHA applies to internecine disputes between the Petitioners and Mr. Lynch regarding their rights *as shareholders*. In particular, § 25 of the SHA says that "dispute[s], controvers[ies] or claim[s] *between the Parties* aris[ing] out of or in connection with *[the shareholders' agreement]*, including any question regarding its 'existence, breach, termination or invalidity,'" must be arbitrated.

39.     But the Petitioners are not raising any issues regarding the agreement's "existence, breach, termination or invalidity," nor are they seeking resolution of any issue regarding either their or Mr. Lynch's rights as shareholders of Kirwan or Kirwan's governance structure. Rather, the Petitioners are here *as creditors*. They have loaned $345 million to Kirwan. The documents evidencing these loans reserve to the Petitioners the right to declare each loan due and payable so long as the Petitioners determine, in their sole discretion, that Kirwan is insolvent. The Petitioners have exercised this right, and now seek enforcement of their rights, as creditors, through the collective remedy

---

[9]     *See In re Petition of Eduard K. Rebgun, as Interim Receiver of Yukos Oil Company, Case No. 06-10775 (RDD).*

afforded by chapter 11. The Petitioners' exercise of these rights simply is not within the scope of the arbitration clause.

40.     Mr. Lynch points to § 5.6 of the SHA by which the Petitioners agreed not to pursue certain remedies under the Loans defined in § 1.1 of the SHA as the initial 2007 acquisition loans (§ 5.6 does not apply to any subsequent loan entered into by Kirwan). Under English law, which governs the SHA, an insolvency petition is treated as an application to open a collective proceeding in respect of which all the claims of all the creditors will be subject to collective disposition. *See Wight v Eckhardt Marine GmbH* [2003] UKPC 37, [26] – [27], [2004] 1 AC 147, [26] – [27] (appeal taken from Cayman Is.). Under English law, § 5.6 does not apply to the Petitioners' pursuit of the collective remedy of bankruptcy. This conclusion is supported by the expert declaration testimony of Mr. Martin Pascoe, QC, an English barrister. *See Pascoe Decl.,* ¶¶ 36-40. Separately under English law, the arbitration clause, applicable by its terms only to disputes over the parties' rights as shareholders, does not apply to insolvency proceedings. *See id.* ¶ 44.

41.     Creditors, whose stakes are in play here, were not parties to the SHA. This would include, but is not limited to, the Petitioners—in their role as lenders. In any event, Kirwan executed the initial purchase loans contemporaneously with the SHA. They expressly preserve the right of the Petitioners, as lenders, to call the loans due. To suggest, as Mr. Lynch does, that the Petitioners somehow waived every conceivable ability to protect their investment, including through insolvency proceedings, would render meaningless the Petitioners' rights to call the loans due if they determine, as they have here, that Kirwan is insolvent. In the words of Mr. Pascoe, this would lead to a commercially absurd result. *See Pascoe Decl.,* ¶ 40. *See, e.g., Garza v. Marine Transp.*

17

*Lines, Inc.*, 861 F.2d 23 (2d Cir. 1988) (courts are not to read a contract so as to render certain of its clauses meaningless).

42.    None of the cases Mr. Lynch cites are relevant.  He relies extensively on *Martinez v. Bloomberg LP*, 740 F.3d 211 (2d Cir. 2014).  But that is a *forum non conveniens* case involving a dispute over an employment agreement; it has nothing to do with bankruptcy.  To the extent it has any relevance, it says that forum selection clauses are enforceable—but only so long as the clause encompasses the claims at issue. *Id.* at 222.  As explained above, the arbitration clause here applies to internecine disputes between shareholders, as shareholders, not the exercise of separate creditor rights to pursue the collective remedy of bankruptcy.  And the facts of *MBNA America Bank*, also cited by Mr. Lynch, concerned the arbitrability of a dispute that arose within the discrete context of an alleged stay violation, not the asserted arbitrability of an entire chapter 11 case. *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006).

43.    In short, Mr. Lynch's reliance on the arbitration clause here is entirely misplaced.  His argument therefore should be given no weight.[10]

### 3.    An Arbitrator Cannot Compel Settlement

44.    Even if Mr. Lynch somehow could validly invoke the arbitration clause, he fails to acknowledge that the fundamental point of this chapter 11 case is to effectuate a settlement that is in the best interests of all stakeholders and within a reasonable range of litigation possibilities.  Under English law, however, *no* arbitrator has the power to

---

[10]    Even if matters relating to the parties' rights as shareholders somehow were relevant, they nonetheless are subject to the core jurisdiction of this Court. *See JWL Entm't Grp., Inc. v. Solby+Westbrae Partners (In re Fisher Island Invs., Inc.)*, 778 F.3d 1172, 1185-86 (11th Cir. 2015) (finding bankruptcy court had core jurisdiction, in the context of an involuntary petition, to resolve intra-shareholder dispute over control of alleged debtor embroiled in global litigation).

impose upon the parties its own view of what is a reasonable settlement. Indeed, an arbitrator has no ability to negotiate a settlement, and no authority to direct the parties how continued litigation should proceed. Fundamentally, the matter is entirely beyond the scope of the arbitration clause.

45.    And even more fundamentally, as explained in the expert declaration of Mr. Pascoe, under English law, there simply is no ability under the SHA or otherwise for an arbitrator to break a deadlock between shareholders who have honestly held but divergent views as to the merits of settlement. *See Pascoe Decl.,* ¶ 45; *see also Astec (BSR) Plc, Re* [1998] 2 BCLC 556 at 584-85 (per Jonathan Parker J).

46.    In short, an arbitrator cannot possibly do anything to resolve the parties' conflict. Only a U.S. bankruptcy court, with the power to approve settlements notwithstanding prepetition governance disputes pursuant to an order that binds all parties, including hold-outs, can resolve this conflict. While the doctrine of *forum non conveniens* is inapplicable here, it is telling that under that doctrine, a court will deviate from a party's chosen forum only if an adequate alternative forum exists that will better serve the ends of justice. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001); *Alfadda v. Fenn*, 159 F.3d 41, 45-56 (2d Cir. 1998).

47.    Because (i) the arbitration clause does not apply to the pursuit of a collective remedy like involuntary insolvency proceedings and (ii) an arbitrator cannot even bring closure to this matter via a compelled settlement, arbitration by definition is not an adequate alternative forum. Indeed, further arbitration will only lead to more stalemate and, worse, likely loss of a highly beneficial settlement opportunity. If, as here, a foreign arbitral forum cannot provide the type of relief available in a U.S. bankruptcy

court, then the parties' forum selection clause should not be enforced. *Martinez*, 740 F.3d at 227-28.

48.     Finally, and with all due respect, the parties already have been down the path of London arbitration—and it has not succeeded in resolving matters or in corralling Mr. Lynch.   In particular, and as explained above, the arbitrator ruled that Kirwan, through its board and shareholders, has the exclusive right to control the litigation, not Mr. Lynch, and that Mr. Deitz is authorized to pursue settlement discussions, not Mr. Lynch.   Mr. Lynch apparently wants to re-arbitrate these matters, implying that his consent was needed for Mr. Deitz to pursue discussions. And he has repeatedly sought to thwart these discussions and derail settlement in pursuit of a payoff for himself.  Mr. Lynch therefore has proven by his conduct that London arbitration is not an adequate alternative forum that will better serve the ends of justice.  Mr. Lynch is a U.S. citizen and needs the compulsion of an order from a U.S. court.  In short, further arbitration here is useless.

**4.     Arbitration Would Inherently Conflict With
The Fundamental Aims Of The Bankruptcy Code**

49.     Even if one could somehow construe the arbitration clause here as applicable to the Petitioners' pursuit of their rights as creditors, and even if an arbitrator theoretically could impose some sort of settlement, this Court still must apply a two-part test to determine whether to enforce the arbitration clause in the bankruptcy context. *In re Lehman Bros. Holdings, Inc.*, No. 14 Civ. 7643(ER), 2015 WL 5729645, at *5 (S.D.N.Y. Sept. 30, 2015).  First, a court must determine whether the proceeding at issue is core or non-core. *U.S. Lines, Inc. v. Am. S.S. Owners Mut. Protection & Indem. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631, 639 (2d Cir. 1999).  Bankruptcy courts must

enforce arbitration clauses of non-core proceedings, but they have the discretion not to do so with core proceedings because such proceedings implicate more fundamental bankruptcy interests.  *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 166 (2d Cir. 2000).

50.    Proceedings are core if either (i) they are unique to or uniquely affected by the bankruptcy proceedings or (ii) they directly affect a core bankruptcy function.  *In re U.S. Lines*, 197 F.3d at 637.  This Court has elaborated on this definition, holding that bankruptcy courts have the discretion to decline to enforce an arbitration clause if the proceeding is "'substantially' core or truly a function of the bankruptcy process;" a core proceeding is one that is "central to the bankruptcy process that Congress contemplated as substantially altering otherwise existing and enforceable rights under applicable non-bankruptcy law." *In re Hostess Brands, Inc.*, No. 12-22052-rdd, 2013 WL 82914 (Bankr. S.D.N.Y. Jan. 7, 2013).

51.    Second, if a proceeding is substantially core, a bankruptcy court should decline to compel arbitration if doing so would "inherently conflict" with, or "seriously jeopardize," the policies and aims of the Bankruptcy Code.  *MBNA America Bank*, 436 F.3d at 107-8.  The objectives of the Bankruptcy Code relevant to this inquiry include "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *Id.* at 108.  Significantly, "[i]n the bankruptcy setting, congressional intent to permit a bankruptcy court to enjoin arbitration is sufficiently clear to override even international arbitration agreements." *In re U.S. Lines*, 197 F.3d at 639.

21

52.    Application of this two-part test here mandates denial of Mr. Lynch's arbitration request.  First, the Petitioners filed this involuntary case in order to propose a plan that implements a settlement of protracted, piecemeal litigation on terms that are reasonable and within the range of litigation possibilities so that value can be maximized; stakeholders are satisfied in the strict order of priority; and hold-outs are bound.  This unquestionably constitutes a "substantially core" bankruptcy function.  Indeed, the Bankruptcy Code specifically provides that proceedings relating to confirmation of a plan are core.  28 U.S.C. § 157(b)(2)(L).  For this reason, this Court has stated that plan confirmation matters are not arbitrable.  *In re Hostess Brands*, 2013 WL 82914, at *4.[11]

53.    Second, arbitration would inherently conflict with, and necessarily jeopardize, these core bankruptcy functions.  Because an arbitrator is powerless to formulate or compel settlement, to stay this bankruptcy in favor of arbitration would ensure the defeat of the fundamental bankruptcy policy that favors settlement.  Indeed, if this case were dismissed, the estate's litigation adversaries ███████████████ ████████████████████████████ while the Petitioners and Mr. Lynch continue their internecine disputes.  And to allow an out-of-the-money stakeholder like Mr. Lynch to try to use arbitration to continue extorting the Petitioners to fund litigation for his personal

---

[11]    While not entirely clear from Mr. Lynch's memorandum, Mr. Lynch appears to suggest that his 10% equity gain somehow has priority over the Petitioner's claims.  That is wrong.  The agreement is clear that Mr. Lynch's gain, if any, is paid only after all of the Petitioners' loans, advances and contributions are paid in full.  Bankruptcy litigation over the enforcement of a contractual subordination clause under section 510 of the Bankruptcy Code is unquestionably a core matter that is not arbitrable.  *See In re Lehman Bros. Holdings*, 2015 WL 5729645, at *10-12.

benefit would offend the most basic aims of the Bankruptcy Code and should not be

countenanced by this Court.[12]

54.    In short, this matter requires the supervision of a U.S. bankruptcy court

with the power to issue orders with worldwide effect that resolve global litigation and

bind all parties in interest. *See MBNA America Bank*, 436 F.3d at 108 (stating a

bankruptcy court's inherent power to enforce its own orders weighs against arbitration).

This Court therefore should decline Mr. Lynch's invitation to kick this dispute to London

for yet another round of arbitration that has not and—with all due respect—cannot

achieve a fair and efficient resolution of these matters.

### B.    Mr. Lynch Should Not Be Allowed To Intervene On Kirwan's Behalf

55.    The Bankruptcy Code provides that only a debtor may file an answer to an

involuntary petition.  11 U.S.C. § 303(d); Fed. R. Bankr. P. 1011(b).  Courts from this

and other districts have confirmed this clear, statutory directive. *See, e.g., In re*

*Westerleigh Dev. Corp.*, 141 B.R. 38, 40 (Bankr. S.D.N.Y. 1992).  Accordingly, "there is

---

[12]   Mr. Lynch otherwise lists three issues that he believes are arbitrable.  That he does so on the next-to-last page of his memorandum is telling about his view of the merits of his argument.  The first issue is whether Mr. Deitz's settlement negotiations breached the SHA.  As noted above, however, the Petitioners are not here to arbitrate the parties' rights as shareholders.  Moreover, that matter was already arbitrated in Mr. Deitz's favor.  The second issue is whether the Petitioners' calling of the loans was improper under the SHA, and the third is whether Kirwan was prejudiced by payment of certain professional fees that, in Mr. Lynch's view, caused Kirwan's insolvency.  These two issues are part of Mr. Lynch's broader assertion that the Petitioners' loans are contingent and disputed and hence, cannot serve as the basis for the filing of an involuntary petition.

As explained further below, Mr. Lynch is wrong on both points.  Moreover, the adjudication of an involuntary chapter 11 petition under section 303 of the Bankruptcy Code, including whether the Petitioner's claims are valid, undisputed and non-contingent, is a substantially core bankruptcy function reserved to the exclusive jurisdiction of the bankruptcy courts.  The Fourth Circuit has issued a ruling on this score that is almost directly on point.  *See Phillips v. Congelton, L.L.C. (In re White Mountain Mining, L.L.C.)*, 403 F.3d 164 (4th Cir. 2005) (refusing to dismiss involuntary petition filed by shareholder/creditor of corporate entity, where other shareholder wanted to arbitrate in London whether the petitioning creditor's advances were loans versus capital contributions; characterization of advances was necessarily a core proceeding that impacted distribution of estate assets).

no express statutory authority for stockholders to contest an involuntary petition filed against their corporation." *In re Westerleigh Dev. Corp.*, 141 B.R. at 40; *In re Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983).   However, this is not an inflexible rule.   A bankruptcy court therefore may, in its discretion, allow a stockholder to contest an involuntary petition. *In re Oakland Popcorn Supply, Inc.*, 213 F. Supp. 665, 667 (N.D. Cal. 1963).   Despite this flexibility, courts have rarely allowed stockholders to intervene on their corporation's behalf—there is a paucity of cases on the subject—and the circumstances where intervention is warranted are very limited.

56.     So, for instance, stockholder intervention may be appropriate if the involuntary petition involves "a plan or scheme to achieve fraud." *In re Westerleigh Dev. Corp.*, 141 B.R. at 40; *In re Ceiling Fan Distrib.*, 37 B.R. at 702 ("Absent a showing of a plan or scheme to achieve fraud or other proscribed conduct, there appears no authority for a stockholder to oppose an involuntary petition under the Bankruptcy Code.").   This view is supported by Colliers. *See* 2-303 *Collier on Bankruptcy* ¶ 303.20[b] ("Under the Bankruptcy Code, the better rule is that equity holders cannot answer the voluntary petition, assuming that there has been no fraud or other misconduct by the involuntary debtor.").

57.     Intervention also has been allowed where directors or officers have conflicted loyalties and are not properly representing the interests of the corporation. *Klein v. Nu-Way Shoe Co.*, 136 F.2d 986 (2d Cir. 1943); *In re Oakland Popcorn Supply*, 213 F. Supp. at 667.   Finally, Judge Schwartzberg allowed a stockholder to intervene in *In re Westerleigh Development Corporation* because the stockholder was significant—he

24

owned 50% of the debtor—and the debtor had ceased all business functions because of the two stockholders' deadlock. 141 B.R. at 40.

58.    However, even a significant shareholder is not entitled, solely by virtue of the size of its stock holdings, to intervene on its corporation's behalf where the shareholder is conflicted. *Kukuda v. Westport Ins. Corp. (In re Michael Angelo Corry Inn, Inc.)*, No. 01-11201, 2002 WL 400780 (Bankr. W.D. Pa. Jan. 8, 2002), *rev'd on other grounds*, *Estate of Inn v. Vega*, 53 F. App'x 205 (3d Cir. 2002). In *Michael Angelo*, the court refused to allow a 100% shareholder to intervene to contest an involuntary petition filed against the corporate debtor. *Id.* at *1. In that case, the debtor had obtained a judgment against an attorney. The attorney's insurance carrier had in turn purchased all of the debtor's stock with the apparent intention of preventing the debtor from enforcing the judgment and hence, the attorney's insurance policy. The carrier sought standing to contest an involuntary petition so that it could continue to prevent enforcement of the judgment. The court declined the carrier's request to intervene on the corporation's behalf, citing the carrier's inherent conflict. *Id.*

59.    Mr. Lynch cannot make any of the showings necessary to warrant his intervention on Kirwan's behalf. He cannot show any scheme or plan to defraud him. The Petitioners are merely attempting to collect valid debts via a settlement of litigation that they exclusively have funded. Unfortunately, given the litigation and its posture, the Petitioners will not be paid in full, and there is no prospect of Mr. Lynch obtaining any recovery. Mr. Lynch may disagree with the Petitioner's business judgment on these matters, but that is not sufficient, in and of itself, to establish fraud. Mr. Lynch similarly cannot show that Kirwan's interests are not being protected. The Petitioners comprise the

overwhelming bulk of Kirwan's capital structure. They have every incentive to maximize value, having spent hundreds of millions of dollars to do so.

60.    In addition, Mr. Lynch cannot establish that he is a proper or adequate representative of Kirwan. Unlike the 50% shareholder in *In re Westerleigh Development Corporation*, Mr. Lynch's ownership stake in Kirwan is a peppercorn, and his right to 10% of any equity gain sits behind $345 million in advances that are contractually senior to Mr. Lynch's rights. Moreover, Mr. Lynch has proven that, like the insurance carrier in *In re Michael Angelo*, he is conflicted. His transparent goal is to hold up a settlement for his own personal gain despite the fact that Kirwan is out of the money. Obviously, he cannot serve as a responsible fiduciary. Mr. Lynch does not propose any coherent alternative that is in the best interests of everyone, nor does he suggest that he is prepared to start funding the litigation.

61.    Based on the foregoing, Mr. Lynch is decidedly *unqualified* to serve as Kirwan's representative. His request to intervene therefore should be denied.

## C.    The Involuntary Filing Is Proper, And An Order For Relief Should Be Entered

62.    The deadline to contest the petition was April 11, 2016. Under section 303(h) of the Bankruptcy Code, if an involuntary petition is not timely controverted, a bankruptcy court shall enter an order for relief. Because Kirwan, the only entity with standing to contest the petition, has not done so, this Court should enter an order for relief. While it is therefore unnecessary to address Mr. Lynch's objections to the petition, the Petitioners nonetheless address them briefly below. The Petitioners reserve the right

26

to support these matters through additional briefing and discovery if the Court allows Mr. Lynch to intervene.[13]

### 1. Kirwan Is An Eligible Debtor Because It Has Property In the United States

63.    Mr. Lynch does not dispute the fact that Kirwan is a corporate entity that holds property in the United States in the form of retainers with its law firms.  *See, e.g.*, *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361 (Bankr. S.D.N.Y. 2014) (finding a non-U.S. entity may be a debtor under the Bankruptcy Code if it holds any property in the U.S.; law firm retainer suffices for purposes of this requirement).   However, Mr. Lynch argues that Kirwan should be deemed not to satisfy this requirement because the retainers, in Mr. Lynch's view, were funded solely to create jurisdiction and were in derogation of the parties' SHA.

64.    Mr. Lynch is wrong for at least three reasons.  First, even if one assumes that the retainers were supplied in derogation of the SHA, the fact remains that Kirwan has property in the United States.   That such retainers arguably breached the SHA therefore is irrelevant.  *See id.* at 373 ("inquiry into the circumstances surrounding the debtor's acquisition of property" in the form of law firm retainers is irrelevant to determination whether debtor is eligible for relief under section 109 of the Bankruptcy Code); *see also In re Yukos Oil Co.*, 321 B.R. 396 (Bankr. S.D. Tex. 2005) (Russian

---

[13]    Mr. Lynch raises a question whether an insider can be a petitioning creditor in an involuntary case. However, the better reasoned view, according to Collier's and published decisions, is that insiders can be petitioning creditors in an involuntary case.  *See* 2-303 *Collier on Bankruptcy* ¶ 303.12[3]; *In re CorrLine Int'l, LLC*, 516 B.R. 106, 145 (Bankr. S.D. Tex. 2014) (finding "the better reasoned reading of § 303(b) does not preclude insiders or recipients of voidable transfers from bringing an involuntary bankruptcy petition"); *In re Colon*, 474 B.R. 330, 363 (Bankr. D. P.R. 2012) ("[D]espite the fact that these excluded creditors [i.e. employees, insiders, transferees] do not count towards the numerosity requirement, if they have claims they may be petitioning creditors under 11 U.S.C. §303(b).").

entity was eligible debtor even though it funded retainers a week prior to the filing of its
bankruptcy petition).

65.     Second, Mr. Lynch is wrong that the retainers were funded to orchestrate
jurisdiction in this Court and in derogation of the SHA. These retainers—which include
$150,000 for Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and $100,000 for
Mandel Bhandari LLP—were requested independently by each firm, *not* at the
Petitioners' or Kirwan's suggestion. Moreover, the Petitioners funded the retainers at
each firm's request long before the Petitioners began to consider filing involuntary
petitions against Kirwan. The retainers therefore were not part of any plan to create
bankruptcy jurisdiction in the United States. And even if they were, as stated by Judge
Chapman in *In re Octaviar Administration*, parties' bankruptcy planning is irrelevant to
the question whether an entity is an eligible debtor. If the entity has property in the
United States, then it is eligible.

66.     Finally, contrary to Mr. Lynch's assertions, the retainers constituted valid
"Operational Expenses," as defined in the SHA, and fell within pre-authorized spending
limits, also as outlined in the SHA. The retainers therefore did not violate the SHA.
"Operational Expenses" under the SHA include "all costs and liabilities incurred in
defending, settling or seeking advice in relation to [the litigation]" or in "asserting legal
title to the shares" of Yukos Finance. The $100,000 retainer for Mandel Bhandari was
paid pursuant to the terms of a cooperation agreement with a former director and officer
of a Yukos-related entity to which Kirwan is a party and which was executed as part of
the Petitioners' efforts in prosecuting the litigation. Mr. Lynch gives no reason why these

expenditures are improper. The Mandel Bhandari retainer therefore constitutes an "Operational Expense."

67.    The $150,000 retainer for Akin Gump covers its ongoing work for Kirwan, including in connection with its defense of an action brought in 2015 in the Southern District of New York against VR Capital, Mr. Deitz, and the chief operating officer of VR Capital in which the parties' litigation adversaries sought information in furtherance of their position against PNS in the Dutch litigation.[14]  The Akin Gump retainer therefore also constitutes an "Operational Expense."  Indeed, this action is identical to a proceeding brought by the litigation adversaries in 2007 in the Southern District of New York against VR Global, Mr. Deitz, *and Stephen Lynch*.[15]  Mr. Lynch never objected to Kirwan's payment of the defense of such proceedings in 2007.  He therefore has no basis to object to funding the same proceedings, seeking the same relief, brought against persons other than him in 2015.

68.    Mr. Lynch contends that, even if the retainers were Operational Expenses, they nonetheless required unanimous shareholder consent under the SHA.  Again, Mr. Lynch is wrong.  Unanimous shareholder consent is required for any "individual item of expenditure" in excess of $250,000.  Clearly, neither retainer exceeded this amount. Unanimous shareholder consent also is required for expenditures in excess of $2 million "when aggregated with all other items of like expenditure or where such expenditure is paid to the same or related parties."  Neither Mandel Bhandari nor Akin Gump has

---

[14]    Dietz Decl. ¶¶ 43, 44; *In re Godfrey*, No. 1:15-mc-325-LAK (S.D.N.Y. filed Oct. 5, 2015).

[15]    *In re Godfrey*, 526 F. Supp. 2d 417 (S.D.N.Y. 2007).

received payments in excess of $2 million.  The retainers therefore do not exceed this cap

and hence, did not require shareholder approval.

69.     These retainers also cannot properly be aggregated with all other legal

costs incurred since 2007, as Mr. Lynch purports to do.  Given the highly disparate

matters handled by different law firms in various jurisdictions around the world since

2007, they cannot fairly be lumped together as "like expenditures" without gutting the

purpose of the clauses, which is to serve as a governor on costs.  The parties never

viewed proposed expenditures in this fashion, and it is too late in the day for Mr. Lynch

to start asserting otherwise.  Indeed, as explained further below, Mr. Lynch himself has

ratified other expenditures for his benefit in amounts far in excess of $250,000 that

arguably were in derogation of these very standards.  He therefore has waived the right to

argue about these standards now.

70.     In short, Kirwan is an eligible debtor because it has property in the United

States.  11 U.S.C. § 109(a).  Mr. Lynch's arguments to the contrary are without merit, and

his motion should be denied.

### 2.     The Petitioners Hold Undisputed, Non-Contingent, Unsecured Claims Against Kirwan

71.     Mr. Lynch does not dispute the fact that the Petitioners advanced $309

million to Kirwan to purchase Yukos Finance, and that the Petitioners advanced a further

$35 million to Kirwan to fund the litigation.  Mr. Lynch also does not dispute the fact that

these advances were documented as loans; were described as loans and the Petitioners as

lenders in the SHA; and were always characterized as loans on Kirwan's financial

statements that he long-since reviewed and approved.  He also acknowledges that the

10% net gain to which he is entitled, if any, can be paid only after all expenses, advances,

contributions, and loans made by the Petitioners are paid in full. However, Mr. Lynch

argues the loans are disputed and contingent, asserting, among other things, that they are

not yet due because the Petitioners orchestrated Kirwan's insolvency by dissipating its

assets, including by causing the expenditure of funds for the Petitioners' own benefit in

violation of the parties' SHA. Mr. Lynch is wrong on all counts.[16]

### (a) The Petitioners Did Not Orchestrate Kirwan's Insolvency

72.    Under the loan documents, the Petitioners are entitled to declare the loans

due when "an insolvency event (*as determined by Lenders [Petitioners]*) occurs in

relation to the Borrower [Kirwan]." (emphasis added). As explained in the expert

declaration of Mr. Pascoe, under English law, this clause vested in the Petitioners

exclusive authority to determine whether to call the loans in their own *subjective*

judgment; their determination to call the loans is not governed by any sort of objective

judgment determinable by a court or arbitrator. *See Pascoe Decl.,* ¶ 20. Based on this

standard, the Petitioners were well within their rights to determine that Kirwan was

---

[16]    Mr. Lynch cannot attempt to re-characterize the Petitioner's loans as equity contributions in an effort to defeat the involuntary petition. There is no published or unpublished decision where a court has allowed a person to defeat an involuntary petition by using the bankruptcy remedy of re-characterization—a remedy that arises only in the context of a bankruptcy case *after* an order for relief has been entered. Moreover, the $309 million in initial loans have been carried on Kirwan's financial statements as debt obligations since 2007. They were characterized as loans in the SHA. Mr. Lynch and the other board members of Kirwan have always been afforded an opportunity to review Kirwan's financial statements and to approve them. Mr. Lynch has never objected to the characterization of the advances as loans. *Cohen v. KB Mezzanine Fund II LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454-58 (3d Cir. 2006) (overarching inquiry in recharacterization analysis is whether parties intended an advance to be debt or equity; parties' intent is to be inferred from what the instruments say and how the parties account for them; affirming district court's finding that multiple cash advances to struggling entity, many of which were not even evidenced by written notes, were properly characterized as debt); *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 93 (Bankr. S.D.N.Y. 2016) (*SubMicron* is "the leading case on recharacterization in bankruptcy").

insolvent.    Indeed, according to Mr. Pascoe, an "insolvency event" occurred under English law, and according to the expert declaration of Mr. Paul Mousel, a Luxembourg attorney, an "insolvency event" also occurred under Luxembourg law. *See Pascoe Decl.,* ¶ 15; *Mousel Decl.,* ¶¶ 25, 45.

73.    This was not a difficult judgment to make—Kirwan has no operating assets and no source of revenue.  Its only asset is PNS, and PNS's only asset is a litigation claim to Yukos Finance that has cost the Petitioners $345 million thus far.  Yet PNS unfortunately is years away from a litigated resolution, one that is not without significant risk to the Petitioners.  The Petitioners have 345 million reasons to maximize the value of that litigation asset, but based on the litigation to date— ████████████████ ████████████████████████████ —and the Petitioners' assessment of the likelihood of success, ███████████████████████████████ ███████████    The only offer on the table is for $137.5 million.  Accordingly, under any objective assessment, Kirwan unquestionably is insolvent.  The Petitioners therefore had no incentive or need to "orchestrate" Kirwan's insolvency.

74.    Mr. Lynch nonetheless criticizes the Petitioners for wanting to bring their litigation costs to an end, arguing that the Petitioners' business decision to stop further funding constituted an "orchestrated" insolvency.  But the Petitioners have no obligation, under the SHA or otherwise, to fund litigation without limit. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

75.     The Petitioners' decision to stop funding therefore was not the "cause" of Kirwan's insolvency.  Kirwan's insolvency instead is a function of facts that Mr. Lynch does not dispute: Kirwan is saddled with $345 million of debt, yet the value of its only asset—the litigation claim to the shares of Yukos Finance—is still ██████████ after eight years of fighting and adverse rulings that have cost $35 million.  Accordingly, Mr. Lynch's crabbed focus on a few retainers and a small handful of payments to counsel that total about 6% of the total litigation costs is myopic, and irrelevant, in the extreme.

76.     Moreover, in eight years, Mr. Lynch never once questioned the use of a single dime of the Petitioner's litigation funding.  Of course, he was happy to see the Petitioners write all the checks.  In fact, his complaint is they do not want to fund more. That the Petitioners have now made the rational business decision to resolve matters does not give Mr. Lynch the right to retroactively audit selected expenditures.  Additionally, Mr. Lynch has no equitable basis to complain about any expenditures because the funds that the Petitioners advanced for such expenditures were not Mr. Lynch's or Kirwan's by right.  They instead were advanced in the Petitioners' *sole* discretion.  And the Petitioners are entitled under the loans, in their *sole* discretion, to determine that Kirwan is insolvent. *Mr. Lynch has no contractual say in the matter.*

77.     Mr. Lynch tries to create a contractual objection by asserting that the Petitioners caused Kirwan to spend funds for the Petitioners' benefit in violation of the SHA.  However, Mr. Lynch fails to explain what possible rationale the Petitioners would have for advancing millions of dollars to Kirwan—only to turn around and cause Kirwan to use the money for something else, unrelated to the litigation.  And even if, as Mr. Lynch asserts, a particular amount that the Petitioners advanced was taken back and

utilized elsewhere, what possible harm could there be to Kirwan or Mr. Lynch? Kirwan

had no cash of its own, and it was not entitled to anything anyway. Kirwan exists and

operates solely by the Petitioners' grace and by virtue of their willingness to continue

funding the litigation.

78.     Finally, the total amounts paid to the law firms Mr. Lynch identifies in his

declaration as allegedly violative of the SHA comprise 15 separate payments, all of

which constitute "Operational Expenses," and only two of which exceeded the $250,000

threshold described above:  payments to Dechert LLP, who represented VR Global in

connection with the parties' arbitration. But what difference does this make? To repeat,

Mr. Lynch cannot articulate how he or Kirwan were harmed because the payments were

made with the Petitioners' money, not Kirwan's. This likely explains why Mr. Lynch

never objected to payment of Dechert LLP's invoices at the time.

79.     Nor could he, *for Kirwan also paid Mr. Lynch almost $750,000 to*

*reimburse him for fees he also incurred in the parties' arbitration.*  Mr. Lynch

conveniently omits any reference to this payment in his papers.   That amount

unquestionably was in excess of the $250,000 threshold. Again, however, it does not

matter, and Mr. Lynch ratified all the payments anyway. Mr. Lynch's demand that funds

should be paid back to Kirwan therefore makes no sense. Since the Petitioners supplied

all the money, they would be repaying themselves. At best, Mr. Lynch could argue

(incorrectly) for such payments to be excluded from Kirwan's accumulated expenses in

calculating his 10% net gain entitlement. But these payments would make no difference

in any such calculation—Mr. Lynch is hopelessly out of the money regardless.

80.     In short, Kirwan is insolvent, not as a result of the Petitioners'
"orchestration," but instead because of $345 million in debt and a litigation asset █
█████████████ that the Petitioners have determined, in the exercise of their business
judgment and after ██████ negotiations, to settle for over $200 million less than what
they are owed.   The Petitioners, like Mr. Lynch, wish circumstances were otherwise.
That they are not, however, does not give Mr. Lynch the right to niggle over a few
dollars—that constitute rounding errors in the grand scheme of Kirwan's capital
structure—in an effort to compel the Petitioners to continue litigation funding without
limit.   The Petitioners properly determined, as was their exclusive right under the loan
agreements, that Kirwan was insolvent and that the loans were due.

### (b)     The Petitioners Did Not Waive All Rights To Protect Their Investment

81.     Mr. Lynch's only other argument in support of his assertion that the
Petitioners' loans are disputed and contingent is that under § 5.6 of the SHA, the
Petitioners agreed not to pursue certain remedies for non-payment of their loans.   He
couples this argument with the assertion that all shareholders of Kirwan must agree to the
commencement of an insolvency proceeding under Kirwan's governing documents.
These points are wrong for several reasons.   First, as noted above, § 5.6 by its terms only
applies to the Loans as defined in §1.1 of the SHA as the initial 2007 acquisition loans (§
5.6 does not apply to any subsequent loan entered into by Kirwan).   Second, as further
explained above, under English law, the Petitioners never waived the right, as creditors,
to pursue the collective remedy of an insolvency proceeding.   *Pascoe Decl.,* ¶¶ 38, 40.

82.     In other words, that Kirwan's governance structure may require unanimity
among *shareholders* to file a voluntary case does not preclude the Petitioners, as

35

*creditors*, from filing an involuntary case. *See id.* Indeed, as described above, the loan agreements afford the Petitioners the exclusive right to determine whether Kirwan is insolvent as a basis for calling the loans. The right to call the loan would be rendered meaningless if, as Mr. Lynch argues, the Petitioners literally could never do a single thing to recover their investment, even in the face of hold-up tactics of an out-of-the-money shareholder. *See id.*

83.    Third, to give Mr. Lynch's arguments credence would be to sanction his asserted right to compel the Petitioners to continue funding this litigation without limit, regardless of any rational assessment of the merits or estimated costs of doing so. It would be to give Mr. Lynch a complete and utter veto over every aspect of the litigation, in direct contravention of Kirwan's governance structure and the arbitrator's ruling that Mr. Lynch has no such right. The parties' SHA cannot sensibly be construed to afford a .0054% shareholder sweeping power to force millions more to be spent by the party that is the 99.9944% shareholder, 99% creditor, and 100% litigation funder.[17]

84.    Finally, Mr. Lynch has no basis to complain that the Petitioners violated any unanimity requirement for the commencement of an insolvency proceeding. Courts in this and other districts have held that a minority shareholder/director like Mr. Lynch, who is woefully out-of-the-money and who has no skin in the game, cannot stand on the ceremony of corporate governance to defy majority stakeholders like the Petitioners the ability to protect their rights via an involuntary petition. For instance, in *In re Kingston Square Associates*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997), Chief Judge Brozman denied

---

[17]    Mr. Lynch seems to suggest that the arbitrator issued an injunction against the filing of this case. That is false. The arbitrator merely enjoined Kirwan, not Petitioners, from amending PNS's charter to create an additional executive body and from appointing as general director of PNS anyone not recommended by Mr. Lynch. Neither of those determinations have anything to do with this case.

motions to dismiss involuntary petitions that had been orchestrated by the debtor's insider

with the debtor's creditor despite charter provisions that restricted the debtor's ability to

file voluntary petitions. *Id.* at 738-39.

85.    Judge Brozman was particularly persuaded by the fact that a single, ill-

informed director had held up the debtor's legitimate, out-of-court restructuring efforts.

The other stakeholders' only recourse therefore was via an involuntary petition. Indeed,

the director in *Kingston Square*, like Mr. Lynch here, breached his fiduciary duties by

acting solely in his own interests, and by refusing to support any efforts by debtors'

stakeholders to develop out-of-court restructuring solutions that benefitted stakeholders

other than himself. *Id.* at 738-39; *see also In re Am. Globus Corp.*, 195 B.R. 263, 265-66

(Bankr. S.D.N.Y. 1996) (Brozman, C.J.) (denying motion to dismiss petition, even

though it was filed without proper authority, where party seeking dismissal only sought to

protect its own interests, and was not acting in furtherance of any fiduciary interests);

*Mgmt. Techs., Inc. v. Morris*, 961 F. Supp. 640, 648-49 (S.D.N.Y. 1997) (commencement

of insolvency proceeding by insider without board authority may be appropriate where

existence of corporation is very much at risk).

86.    Similarly, in *In re Houston Regional Sports Network L.P.*, 505 B.R. 468

(Bankr. S.D. Tex. 2014), affiliates of a debtor filed involuntary petitions against the

debtor, whose operating agreement required the unanimous consent of its managers to

file a voluntary petition. One of the debtor's owners sought dismissal of the involuntary

petitions as bad faith filings. The court denied the request, holding that a desire to

preserve value was sufficient to overcome charges of bad faith. *See id.* at 470-71, 478.

Significantly for these cases, the court observed:

The Court concludes that an end run of the provision [restricting bankruptcy filings] does not necessarily lead to a conclusion that Comcast [the petitioning creditor] acted in bad faith. Not every contractual breach is done in bad faith. If Comcast Partner made an end run around the contract (or even breached it), then [it] may be liable for damages. [But t]hat is a far cry from bad faith.

The evidence reflects that the original involuntary petition was orchestrated by Comcast for the purposes of preserving value and rehabilitating [the debtor]. . . . Even if done in breach of the spirit of the governance documents, and in collusion with [others], the filing was not done in bad faith. A thoughtful opinion in a similar situation was issued by the United States Bankruptcy Court for the Southern District of New York. *In re Kingston Square Associates*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997). In sum, when the petitioning creditors act with the intention of preserving the Estate, the sole fact that a voluntary filing was precluded by state-law organizational documents will not make the involuntary petition one filed in bad faith.

*Id.* at 478.

87.     In short, purported restrictions on the ability of a debtor to be placed into bankruptcy do not mandate dismissal; such restrictions are not the "be-all, end-all" of the analysis and should instead be viewed very skeptically. As Judge Gropper said in *In re Quad-C Funding LLC*, 496 B.R. 135 (Bankr. S.D.N.Y. 2013), "[t]he Court recognizes that some courts have applied—without reservation—supermajority and other clauses that are designed to impede a debtor's entry into bankruptcy. *These clauses would permit minority equity holders to hold a bankruptcy filing hostage even where there is no dispute that there should be a judicial dissolution or reorganization of the debtor*." *Id.* at 143 (emphasis added) (citation omitted).

The mischief of such clauses is well-illustrated by the present case: if Crossroads obtained dismissal, it *might be able to continue to burden creditors with the costs of its own litigation*, prevent the Debtor from engaging in legitimate business operations, and avoid the risk of a potentially meritorious preference suit against it. As has been stated, "there is no reason to treat bankruptcy as a bogeyman, as a fate worse than death—even, as the majority does, as a 'penalty'. . . ."

38

*Id.* at 143-44 (emphasis added) (citation omitted).

88.     In sum, the Petitioners hold valid, undisputed, non-contingent, unsecured claims against Kirwan.  The Petitioners rationally determined to suspend funding of the litigation so they can settle.  They validly declared the loans due and payable, exercising the authority vested *exclusively* in them to declare Kirwan insolvent based on facts that no rational person can dispute.  There was never any dissipation of Kirwan's assets to create insolvency, nor was there any rational economic incentive to do so.  The Petitioners did not agree to fund the litigation without limit, and they did not forever and completely surrender the right to protect their investment under every conceivable circumstance, especially in the face of Mr. Lynch's hold-up tactics.  The petition, therefore, should be granted and an order for relief entered forthwith.

**D.     Neither Abstention Nor Dismissal Under
        §§ 305 and 1112 Of The Bankruptcy Code Is Warranted**

89.     Mr. Lynch seeks abstention under section 305 of the Bankruptcy Code or, alternatively, dismissal under section 1112 of the Bankruptcy Code.  These arguments are largely repetitive of his other arguments already addressed above.  The Petitioners' points below therefore are brief.

**1.      Mr. Lynch Has Failed To Carry His Burden To Prove
         That Abstention Is Warranted Under Section 305**

90.     Section 305(a) of the Bankruptcy Code allows a court to abstain from a bankruptcy case if the interests of creditors and the debtor would be better served by abstention.  Abstention is "an extraordinary remedy that should be used sparingly and not as a substitute for a motion to dismiss under other sections of the Bankruptcy Code [such as section 1112]."  2 *Collier On Bankruptcy* ¶ 305.02 (Alan N. Resnick & Henry J.

39

Sommer eds., 16th ed. 2016); *see also In re Paper I Partners, L.P.*, 283 B.R. 661, 678

(Bankr. S.D.N.Y. 2002) ("A motion under section 305(a) to dismiss a petition or suspend

the bankruptcy case is a form of extraordinary relief. Abstention pursuant to section 305

of the Code is a power that should only be utilized under extraordinary circumstances."

(citation omitted)); *In re Corino*, 191 B.R. 283, 288 (Bankr. N.D.N.Y. 1995) (finding that

the moving party had not met "the heavy burden of proof" to succeed on a section 305(a)

motion).

91.    Mr. Lynch, as the moving party, has the burden of proof to demonstrate

that abstention is appropriate under section 305 of the Bankruptcy Code. *See, e.g., In re

Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008). To satisfy his

burden, Mr. Lynch must demonstrate that the interests of both the creditors and the debtor

would be better served by dismissal or abstention. *See Eastman v. Eastman (In re

Eastman)*, 188 B.R. 621, 624-25 (B.A.P. 9th Cir. 1995) (reversing order dismissing case

because lower court failed to make finding that dismissal was in interests of both the

debtor and its creditors); *In re Aerovias Nacionales de Colom. S.A. Avianca*, 303 B.R. 1,

9 (Bankr. S.D.N.Y. 2003) (finding no basis to dismiss or suspend proceedings because

debtor would not be better served and creditors were well served by bankruptcy

proceeding). Moreover, because this standard is not a mere balancing test but requires

both the debtor's interests *and* the interests of the debtor's creditors to be better served by

dismissal, "few fact patterns fall within section 305(a)." 2 *Collier on Bankruptcy, supra*,

¶ 305.02[1].

92.    This Court previously has considered motions for abstention under section

305 and the relevant considerations in determining whether to grant or deny same. *In re*

40

*Persico Contracting & Trucking, Inc.*, No. 10-22736 (RDD), 2010 WL 3766555 (Bankr.

S.D.N.Y. Aug. 20, 2010). Those considerations weigh against abstention here, i.e., the

petitions here were filed by the largest creditor, not a "small number of creditors"; there is

no "state insolvency proceeding or other out-of-court arrangement pending"; there is no

other proceeding that "has proceeded so far . . . that it would be costly and time

consuming to start afresh with the Federal bankruptcy process"; and there is no

"alternative means of achieving an equitable distribution of assets." *Id.* at *4; *see also In

re Paper I Partners, L.P.*, 283 B.R. at 678.

93.     In *Persico*, this Court held that the most important consideration in

determining whether to abstain is "the purpose for which bankruptcy jurisdiction has

been sought," i.e., abstention may be appropriate in two-party disputes where the

petitioning creditor is merely using the process as a "debt collection tool" against the

debtor. 2010 WL 3766555, at *4. There are only two primary parties to this case, but as

outlined above, the Petitioners have filed this case not merely as a debt collection tool,

but rather (i) to maximize the value of Kirwan by implementing a court-approved

settlement that binds all parties, a goal that will be torpedoed by Mr. Lynch if this Court

abstains, and (ii) to eliminate the possibility of further governance disputes that have

precluded a rational resolution to the litigation.

94.     Arbitration, in short, has proved fruitless, and only a U.S. bankruptcy

court can provide the benefit of global orders that are binding on all parties. Abstention

therefore should be denied.

### 2.     Mr. Lynch Has Failed To Carry His Burden That Dismissal Is Warranted Under Section 1112

95.    A bankruptcy petition should not be dismissed if the case serves a legitimate bankruptcy purpose.  In this regard, in order to obtain dismissal, Mr. Lynch must show *both* (i) that the reorganization process for Kirwan is objectively futile, *and* (ii) that the Petitioners acted in subjective bad faith in filing the petition.  *See C–TC 9th Ave. P'ship v. Norton Co. (In re C–TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310-11 (2d Cir. 1997); *Davis v. M&M Developer, LLC (In re MBM Entm't, LLC)*, 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015); *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009); *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997).

96.    This basis for dismissal is to be used "sparingly" and only in "extraordinary circumstances."  *In re Century/ML Cable Venture*, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003); *accord In re 68 W. 127 St., LLC*, 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002) (Drain, J.); *In re Sletteland*, 260 B.R. 657, 662 n.2 (Bankr. S.D.N.Y. 2001); *In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001); *see also In re D&F Meat Corp.*, 68 B.R. 39, 40 (Bankr. S.D.N.Y. 1986).  Indeed, it is an extreme remedy reserved for cases involving some "sort of 'smoking gun,' indicating an 'overt intent to inconvenience or frustrate creditors' rights beyond the congressionally permitted limits.'"  *PNC Bank, Nat'l Ass'n v. Park Forest Dev. Corp. (In re Park Forest Dev. Corp.)*, 197 B.R. 388, 394 (Bankr. N.D. Ga. 1996) (quoting *Sentry Bank & Trust v. Goulding Place Developers, Inc. (In re Goulding Place Developers, Inc.*), 99 B.R. 493, 499 (Bankr. N.D. Ga. 1989)).

97.    Determinations whether to dismiss a case are within the discretion of the court.  *In re Murray*, 543 B.R. 484, 492 (Bankr. S.D.N.Y. 2016).  As Judge Gerber

recently said, the "existence of a two-party dispute does not, by itself, warrant dismissal of a case where there are other legitimate bankruptcy objectives to achieve (such as avoiding a fire sale of significant estate assets[)].". *Id.* at 493. However, a creditor cannot turn the bankruptcy court into a "rented battlefield," *id.*, or use it as a "'litigation tactic,'" *id.* at 491 (citation omitted), solely to collect a debt; "*[t]he Bankruptcy court is not a collection agency.*" *Id.* at 494 (alteration in original) (quoting *In re Mountain Dairies, Inc.*, 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007)). Nor is an involuntary bankruptcy petition appropriate where there are "no other creditors' needs and concerns to protect" and "no other bankruptcy goals to achieve." *Id.* at 486.

98.     Mr. Lynch cannot carry his heavy burden of proving that the Petitioners have acted in subjective bad faith. To the contrary, for all the reasons outlined above, the Petitioners have been forced into this forum to protect themselves from *Mr. Lynch's* subjective bad faith. Moreover, Mr. Lynch makes no effort to show how the use of chapter 11 here is objectively futile. *In re RCM Global Long Term Capital Appreciate Fund, Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) ("[A] court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing."). To the contrary, chapter 11 is the perfect vehicle for resolving the litigation issues that have plagued Kirwan for eight years. This Court can hold an evidentiary hearing on whether the proposed disposition of the litigation is within the range of litigation possibilities and should be approved. It can implement that settlement under a plan. And the plan can approve exculpations and releases designed to protect the settlement from collateral attacks in other forums.

99.     Mr. Lynch's reliance solely on the factors set forth in *In re C-TC 9th Avenue Partnership* is insufficient to satisfy his burden to demonstrate bad faith.  Those factors, even if applicable, are merely the starting point.  This Court previously has determined that the better approach is to focus on the permissible uses of the Bankruptcy Code because "taken out of context, the exercise of certain rights under the Bankruptcy Code that are perfectly legitimate may appear hurtful, even malicious, yet the exercise of a statutory right should rarely, *if ever*, be said to be in bad faith." *In re 68 W. 127 St.*, 285 B.R. at 844 (emphasis added).  The Petitioners seek nothing more than the exercise of certain rights under the Bankruptcy Code.  That is *not* bad faith.  Mr. Lynch's request to dismiss this case therefore should be denied.

## NOTICE

100.     Notice of this objection shall be provided to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the Debtor; (c) Mr. Stephen Lynch; (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; and (f) any other party entitled to notice pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b).  The Petitioners respectfully submit that no other notice is necessary or required.

## CONCLUSION

For the foregoing reasons, the Petitioners respectfully request that the Court (i) enter an order denying Mr. Lynch's motion and (ii) grant the Petitioners such other relief as the Court deems just, proper and equitable.

Dated: New York, New York
       May 3, 2016

SKADDEN, ARPS, SLATE,
MEAGHER  & FLOM LLP

By: */s/ Jay M. Goffman*
    Jay M. Goffman
    Mark A. McDermott
    Suzanne Lovett
    Four Times Square
    New York, New York 10036
    (212) 735-3000

*Counsel to Petitioning Creditors,*
*Lapidem Ltd. and Mascini Holdings*
*Limited*
