## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | ) | |
| **In re** | ) | **Chapter 11** |
| **KIRWAN OFFICES S.A.R.L.** | ) | **Case No. 16.22321 (RDD)** |
| | ) | |
| | ) | |
| **Debtor** | ) | **Involuntary Petition** |
| | ) | **Pending** |

## DECLARATION OF MING-YEE SHIU

I, Ming-Yee Shiu, declare under penalty of perjury of the laws of the United States that the following is true and correct:-

1.  I am a barrister-at-law in England and Wales. I obtained a First Class degree in law at St John's College, University of Cambridge in 1999, and an LL.M. from the University of Pennsylvania Law School on a Thouron Fellowship in 2001. I was called to the Bar of England and Wales in 2000 and I was called to the New York Bar in 2005. I have been in practice as a barrister since 2002, initially from 2 Temple Gardens, Temple, London and then since 2012 at Littleton Chambers, 3 King's Bench Walk, Temple, London. My main practice areas are company law and insolvency, with particular focus on shareholder disputes and directors' duties, commercial fraud and the commercial aspects of employment law. My curriculum vitae[1] and copies of the cases and statutes referred to in this declaration together with a list of the authorities is exhibited with this declaration.

2.  I have been asked to prepare this declaration by Mr Stephen P. Lynch, through his solicitors Nabarros, in respect of a number of questions regarding:

---

[1] Appendix 1.

1

(1) a Shareholders Agreement ("the SHA") dated 30 August 2007 entered into in respect of Kirwan Offices S.A.R.L. ("Kirwan") by the Mascini Holdings Limited (MHL), Lapidem Limited (LL), Renaissance Holdings Management Limited (which transferred its interest in MHL to VRGP and its affiliate in 2013) and Mr Stephen P. Lynch. MHL is the registered holder of "A Shares" in Kirwan, LL is the registered holder of "B Shares" in Kirwan and Mr Lynch is the registered holder of a "C Share" in Kirwan;

(2) certain loan agreements ("the Loans") entered into between Mascini Holdings Limited and Lapidem Ltd as lenders ("the Financing Shareholders"), and Kirwan as borrower, for the purpose of funding the purchase price at auction of assets of Yukos Oil and, to a lesser extent, for the purpose of financing of Kirwan's operational expenses;

(3) certain further loan agreements ("the Cash Call Loans") entered into between Mascini Holdings Limited and Lapidem Ltd as lenders ("the Financing Shareholders"), and Kirwan as borrower from 2007 to 2012, said to have been entered into by way of subsequent financing of Kirwan's operational expenses in response to cash calls under the SHA.

3.   The above agreements each contain a choice of law clause electing English law as the applicable law to the agreement.

4.   I have been requested to and have expressed my own views in this declaration as to a number of issues to which English law applies. In giving my views in this declaration, it is intended to provide evidence of how those issues might be decided by an English Court. It is not in any way suggested that the Court hearing this matter is bound to accept my views.

**Principles of interpretation under English law**

5.   Before addressing the specific questions I have been asked, I set out below a brief summary of the approach under English law to the construction of contracts, in particular commercial contracts and shareholders agreements.

2

16-22321-rdd   Doc 23   Filed 06/06/16   Entered 06/06/16 22:21:08   Main Document
Pg 3 of 42

6.    To be legally enforceable the terms of a contract must be certain. If a contract term is vague, ambiguous or silent on the issue before the court, the court may attempt to make sense of the parties' bargain by using various interpretation techniques which focus on finding the parties' intentions. The starting point is always to interpret the express words used by the parties. Lord Neuberger in *__Marley v Rawlings__*[2] summarised the position; in ascertaining intention the court has to identify the meaning of the words:

    (1)    In the light of:
        (a)    The natural and ordinary meaning of those words,
        (b)    The overall purpose of the document,
        (c)    Any other provisions of the document,
        (d)    The facts known or assumed by the parties at the time that the document was executed, and
        (e)    Common sense, but
    (2)    Ignoring subjective evidence of any party's intentions.

7.    The Courts also have to consider the factual matrix and whether giving a clause a particular or restricted meaning would lead to an unfair or unreasonable result.

8.    In *__Investors Compensation Scheme Ltd v. West Bromwich Building Society__*[3], Lord Hoffman in the House of Lords set out the following basic rules to be used as a starting point for interpreting unclear contractual clauses:

    (1)    The court has to consider what meaning the contract or clause would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties at the time they entered into the contract.

    (2)    The background to the contract must be considered. This background can include anything which would have affected the way in which the language used in the contract would have been understood by a reasonable man.

---

[2] [2014] 2 WLR 213; Appendix 2.
[3] [1998] 1 WLR 896; Appendix 3.

3

(3)   Pre-contractual negotiations are not, however, admissible to decide what the parties subjectively intended (unless the parties are looking to rectify the contract on the grounds of a mistake contained in the contract that does not reflect what has been agreed, rather than merely interpreting the words used in the contract).

(4)   The court has to distinguish between the meaning of individual words and the meaning of a document as a whole. It is necessary to look at the background to the document to decide what the parties using the words in question would reasonably have meant by them. The background is also relevant in deciding whether, in fact, the parties used the wrong words.

(5)   Words should be given their natural and ordinary meaning. On the other hand, if it is clear from the background to the contract that something has gone wrong with the language and a literal interpretation of the words in a commercial contract is going to flout business common sense, business common sense should prevail.

9.   In *Rainy Sky v. Kookmin*[4], the Supreme Court clarified that where a term of a contract is open to more than one interpretation, it is generally appropriate to adopt the interpretation which is most consistent with business or commercial common sense. Lord Clarke gave guidance which may be summarised as follows:

(1)   Where the parties have used unambiguous language, the court must apply it even if this produces an "*improbable commercial result*". It is not for the court to rewrite the language the parties have used in order to make the contract conform to business common sense.

(2)   On the other hand, language is a very "*flexible instrument*" and if it is capable of more than one construction, it is not necessary for a particular construction to

---

[4] [2011] 1 WLR 2900; Appendix 4.

4

produce an absurd or irrational result before the court can give effect to the commercial purpose of the agreement.

(3)    It is quite possible for a clause to have two potential meanings with neither meaning flouting common sense. In that case, the court should adopt the more, rather than the less, commercial construction.

10.    However, in the recent case of ***Arnold v Britton***[5] the Supreme Court has emphasised the importance of the language expressed in the contract and that commercial common sense should not be invoked to undervalue the importance of that language, nor should it be invoked retrospectively or used to reject the natural meaning of a provision simply because that provision appears to have been very imprudent. In other words, the Courts will not protect a party from a bad bargain. The Court set out the following factors, as to which the first five are relevant to the use of commercial common sense:

"17. First, the reliance placed in some cases on commercial common sense and surrounding circumstances (eg in *Chartbrook* [2009] AC 1101, paras 16-26[6]) should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision. Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.

18. Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. That is simply the obverse of the sensible proposition that the clearer the natural meaning the more difficult it is to justify departing from it. However, that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the natural meaning. If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.

19. The third point I should mention is that commercial common sense is not to be invoked retrospectively. The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language. Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made. Judicial

---

[5] [2015] AC 1619; Appendix 5.
[6] Appendix 6.

observations such as those of Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG [1974] AC 235*, 251[7] and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191*, 201[8], quoted by Lord Carnwath JSC at para 110, have to be read and applied bearing that important point in mind.

20. Fourthly, while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight. The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed. Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

21. The fifth point concerns the facts known to the parties. When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.

22. Sixthly, in some cases, an event subsequently occurs which was plainly not intended or contemplated by the parties, judging from the language of their contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention. An example of such a case is *Aberdeen City Council v Stewart Milne Group Ltd 2012 SC (UKSC) 240*[9], where the court concluded that "any ... approach" other than that which was adopted "would defeat the parties' clear objectives", but the conclusion was based on what the parties "had in mind when they entered into" the contract: see paras 21 and 22."

11. Where there is ambiguity, as a last resort the Courts may adopt an interpretation *contra proferentem*, namely the interpretation of a clause which does not favour the person who relies upon and put forward the relevant clause.

12. In interpreting contracts the Courts are often requested to consider whether terms should be implied. The Courts will imply terms when they consider that it is necessary to do so to make the contract work. It is not sufficient that it would be reasonable to do so.

13. A shareholders' agreement takes effect in English common law as a commercial contract and is not subject to any special legal rules. A shareholders' agreement is

---

[7] Appendix 7.
[8] Appendix 8.
[9] Appendix 9.

6

designed to improve and protect the legal position of the shareholder in a private limited company by creating legally binding contractual rights enforceable irrespective of the company's constitution. The shareholders' agreement provides the shareholder with a direct contractual right of action against the other parties to the agreement which may include the company.

## 1.  SHAREHOLDERS' AGREEMENT ("SHA")

**Funding and spending (general)**

1.1   **What does the SHA state in relation to the financing of Kirwan? In other words, how Kirwan was/is to be financed pursuant to the SHA?**

1.2   **Did the funds that the Financing Shareholders provided to Kirwan under the Loans and loans funding Cash Call Notices belong to Kirwan or remain the property of the Financing Shareholders?**

1.3   **Could as a matter of the SHA and the loan agreements, Kirwan spend the funds provided to it by the Financing Shareholders under the loans funding Cash Call Notices on expenses other than Operational Expenses?**

14.   As regards question 1.1, the SHA sets out a number of provisions in relation to the financing of Kirwan:

(a)   At paragraph (F) in the preamble to the SHA, it is stated, *"The A Shareholder and the B Shareholder have also agreed to provide finance by way of loans to the Company on the terms set out in Clause 2 of this Agreement."*.

(b)   Clause 2.1 of the SHA provides for financing by way of subscription for shares by the A and B Shareholders, to take place on the Subscription Date, and by way of loans to the Company:

*"2.1  On the Subscription Date:*

7

     2.1.1 the A Shareholder will subscribe for such number of A shares as shall result in an aggregate holding representing 60% of the ordinary issued share capital of the Company... for a subscription price of US$1,489,757;

     ...

     2.1.3 the B Shareholder will subscribe for such number of B shares as shall result in an aggregate holding representing 40% of the ordinary issued share capital of the Company... for a subscription price of US$993,172;

     ...

     2.1.5 the A Shareholder shall make the loans to the Company in accordance with the A Shareholder Interest-Bearing Loan Agreement and the A Shareholder Interest-Free Loan Agreement; and

     2.1.6 the B Shareholder shall make the loans to the Company in accordance with the B Shareholder Interest-Bearing Loan Agreement and the B Shareholder Interest-Free Loan Agreement."

(c)    The A and B Shareholder "Interest-Bearing Loan Agreement" and A and B Shareholder "Interest-Free Loan Agreement are defined in Clause 1.1 and are collectively referred to as the "Loans" in the SHA:

"A Shareholder Interest-Bearing Loan Agreement" means the loan agreement in the amount of US$127,500,000 between the A Shareholder and the Company in the agreed form;"

"A Shareholder Interest-Free Loan Agreement" means the loan agreement in the amount of US$21,000,000 between the A Shareholder and the Company in the agreed form;"

"B Shareholder Interest-Bearing Loan Agreement" means the loan agreement in the amount of US$85,500,000 between the B Shareholder and the Company in the agreed form;"

"B Shareholder Interest-Free Loan Agreement" means the loan agreement in the amount of US$14,000,000 between the B Shareholder and the Company in the agreed form;".

(d)    Clause 2.3 provides for a portion of the funding from the loans to be retained for "Operational Expenses":

> "2.3 The Shareholders agree that US$1,567,976.40 of the amounts payable by
> the A Shareholder under the A Shareholder Interest-Bearing Loan
> Agreement and US$1,045,317.60 of the amounts payable by the B
> Shareholder under the B Shareholder Interest-Bearing Loan Agreement
> shall be retained by the Company on account of Operational Expenses and
> shall not be used by the Company for the purposes of the loan referred to in
> Clause 4.2.1".

(e)   "Operational Expenses" are defined in Clause 1.1:

> ""*Operational Expenses*" means in relation to each Group Company the
> following expenses which shall be reasonably incurred and properly
> documented, and approved as required in accordance with Clause 9.1.1 and
> Part 3 of Schedule 3: (i) all costs and liabilities incurred in defending, settling
> or seeking advice in relation to Claims; (ii) all Auditors' and other professional
> expenses associated with the valuation of the Group's assets; (iii) all direct
> costs associated with reporting requirements incurred by the Group; (iv) all
> costs and expenses incurred in connection with asserting legal title to the shares
> in Yukos Finance BV and/or its Subsidiaries; (v) all professional fees and
> disbursements incurred in association with holding, protecting and maintaining
> the value of the assets of the Group Companies; (vi) all tax and governmental
> charges (if any) levied against the Group; (vii) all bank charges arising on bank
> accounts held in the name of or on behalf of the Company; (viii) all costs,
> liabilities or professional fees arising from a claim against an employee, agent
> or director of any Group Company; and (ix) all professional indemnity policy
> premiums payable by a Group Company in connection with the management
> and administration of the Group".

(f)   The various references to "Claims, "Group Company", "Auditors" and
"Subsidiaries" are defined in Clause 1.1. I shall not set them out at this juncture,
although the definition of "Claims" in particular is relevant later in this report.

(g)    The loan referred to in Clause 4.2.1 which is referred to in Clause 2.3 is in respect of an obligation of the Shareholders under Clause 4.2.1 to procure a loan by Kirwan to PNS for the purpose of paying the Auction Price under the Auction SPA and bank charges and other ancillary expenses relating to the acquisition of Yukos Finance BV:

> "4.2.1 *The Shareholders undertake to procure that the Company makes a loan to Promneftstroy on 31 August 2007 in an amount equal to the US dollar equivalent of 6,318,688,800 Russian Rubles according to the market selling rate for the exchange of US dollars into Russian Rubles on 31 Auguut 2007 as quoted by Gazprombank.*

> 4.2.2 *The Parties shall procure that Promneftstroy shall use the proceeds of the loan contemplated in Clause 4.2.1 for the sole purpose of paying the Auction Price pursuant to the Auction SPA (having regard to the payment of the Auction deposit) and meeting bank charges and other ancillary expenses relating to the acquisition of Yukos Finance BV under the Auction SPA".*

(h)    In addition to the subscription for shares and loans referred to above, the SHA also provided for further financing of Kirwan by way of cash calls under Clause 10. I shall not set out the entirety of Clause 10 here; the key provisions are:

> "10.1    *The Board may serve on the Financing Shareholders one or more Cash Call Notices at such times and in such amounts as it deems necessary (acting reasonably) in order to fund the Operational Expenses, provided that where the service of a Cash Call Notice is a Special Majority Shareholder Reserved Matter, Special Majority Required Shareholder Consent must be obtained before that Cash Call Notice is served.*

> ...

> 10.3    *Save as otherwise agreed by the Financing Shareholders, funding to be provided to the Company pursuant to a Cash Call Notice shall be provided in the proportions:*

10

   10.3.1 *as to 85%, by way of interest-bearing loans;*

   10.3.2 *as to 14%, by way of interest free loans; and*

   10.3.3 *as to 1%, by way of subscription for Shares."*

15. As regards question 1.2, where a loan is made from A to B, the position is that legal and equitable title to the money loaned passes to the borrower. If it is contended in respect of a transfer purporting to be a loan that no transfer of equitable title has taken place between A and B, this would have to be proved on the basis that the transfer did not, in fact, constitute a loan and that the funds were transferred on some other basis pursuant to which the "lender" retained a beneficial interest in the money. I have not been provided with evidence to support some other such basis in respect of the Loans in the present case. It does seem (based upon the provisions relating to Cash Call Notices, Return and the Distribution Policy set out in Clause 11, and paragraph (a) of Schedule 4) that the transfer of funds amounted to capital contributions to the business rather than loans. This would not mean that legal and equitable title to the money did not pass. Rather, if the transfer of funds amounted to capital contributions, the funds will have been provided in exchange for an equity interest or to satisfy a capital commitment or obligation to fund the company.

16. As regards question 1.3, Clause 10.1 of the SHA provides that the Board may serve the Cash Call Notices "in order to fund the Operational Expenses". Accordingly it is clear that the purpose of a Cash Call Notice is to obtain funding for the Operational Expenses and for no other purpose. This is supported by the references in the loan agreements to the Cash Call Notice request for funding, and the reference to the purpose of the loan being the funding of the Operational Expenses of Kirwan.

**Engagement of and payment to Akin Gump**

**1.4 Did the engagement of Akin Gump Strauss Hauer and Feld LLP ("Akin") and payment of its invoices by Kirwan constitute a breach of the SHA by the Financing Shareholders? Please consider the following sub-questions:**

11

1.4.1    Was engagement of Akin and payment of Akin's invoices by Kirwan in connection with representation of VR Capital Group Ltd. ("VRCG"), Messrs. Johnson and Deitz in an application for an order for discovery in aid of a foreign proceeding by Messrs. Godfrey and Misamore, Yukos Finance and Yukos International an Operational Expense as a matter of the SHA?

1.4.2    Was Akin's engagement and payment of its invoices a Unanimous Shareholder Reserved Matter (that required a Unanimous Required Shareholder Consent)?

1.4.3    Was it a breach of the SHA by the Financing Shareholders (clauses 5.5.4, 6.1, 6.3.9, 9.1) that Akin was engaged and paid without a Unanimous Required Shareholder consent?

1.4.4    Was it also a breach of the SHA (clause 6.1) by the Financing Shareholders that Akin was engaged and paid without the same being approved by the Board (board of managers of Kirwan)?

17.    As regards question 1.4.1, I have considered the engagement letter of Akin dated 13 October 2015, the by-laws of Kirwan and the SHA. The definition of "Operational Expenses" provides at item (i) of the definition, *"all costs and liabilities incurred in defending, settling or seeking advice in relation to Claims"*. The *"Claims"* are defined as *"any and all claims, potential claims, counterclaims, potential counterclaims, right of set-off, indemnity, counter-indemnity, demand, proceedings, liabilities or cause of action of any kind (whether known or unknown, asserted or unasserted, as at the date of this Agreement) against Yukos Finance BV and/or the other Yukos Subsidiaries including, but not limited to, all such matters relating to the award in favour of Moravel Investment Limited (in the amount of approximately US$661,000,000 plus accrued interest), Rosneft/YNG claims (in an amount of approximately US$2,900,000,000), any claim of PKN Orlen SA related to the escrow account established in an amount of approximately US$250,000,000 in relation to its purchase of Mazeikiu Nafta AB, the prospective claim of Glendale Group Limited (in an amount of approximately US£3,000,000,000) and all other claims, proceedings, liabilities or*

12

*actions of any kind (whether known or unknown, asserted or unasserted as at the date hereof) against Yukos Finance BV and/or the other Yukos Subsidiaries".*

18.  Item (iv) of the definition of "Operational Expenses" provides, *"all costs and expenses incurred in connection with asserting legal title to the shares in Yukos Finance BV and/or its Subsidiaries".*

19.  I am given to understand that the foreign proceedings referred to are Dutch proceedings involving issues as to the title to the Yukos Finance shares. I understand that Godfrey and Misamore were seeking discovery against VRCG, Mr Richard Deitz as it founder and president, and Mr Johnson as its CFO, in relation to their involvement in the acquisition of the shares in Yukos Finance.

20.  In my view as a matter of English law interpretation, the motion for discovery and the related Dutch proceedings are not within the definition of "Claims" as they do not involve claims against Yukos Finance BV and/or the other Yukos Subsidiaries.

21.  I have considered whether the motion for discovery and the related Dutch proceedings would be considered to fall within item (iv) of the definition of "Operational Expenses" as a matter of English law. It appears to me that the legal costs incurred in relation to the defence of PNS/Mr Lynch in defending the title to Yukos Finance BV may be costs and expenses that were incurred "in connection with asserting legal title to the shares in Yukos Finance BV", but presumably by PNS, not by Kirwan. As regards the motion for discovery, the legal costs incurred were on behalf of VRCG, Mr Deitz and Mr Johnson, and not Kirwan. Therefore I consider that on a proper interpretation of the clause, these expenses were not incurred on behalf of Kirwan. It may be that the parties to the Shareholders Agreement and/or the Board have nonetheless been prepared (at least previously) to agree to Kirwan funding such legal costs, but as a matter of contractual interpretation I consider that an English court would find that these expenses are not within the definition of "Operational Expenses".

22.  As regards question 1.4.2, if I am correct in my view that the legal costs incurred with Akin Gump were not "Operational Expenses", I consider that they would fall within the first bullet point in the list of Unanimous Shareholder Reserved Matters at Part 3 of

13

Schedule 3 of the SHA. This provides, *"Expenditure by the Financing Shareholders or any Group Company over and above that reasonably required to meet Operational Expenses"*. Accordingly, in my view Unanimous Required Shareholder Consent would have been required to enter into this engagement.

23.   Alternatively, if the legal costs incurred with Akin Gump fall within the definition of "Operational Expenses", this will have required Unanimous Required Shareholder Consent if the conditions set out at the fifth bullet point in the list of Unanimous Shareholder Reserved Matters at Part 3 of Schedule 3 of the SHA are satisfied. This provides, *"Incurring of any Operational Expenses by the Financing Shareholders or any Group Company either (a) in excess of US$250,000 in respect of each individual item of expenditure or (b) in excess of US$2,000,000 when aggregated with all other items of like expenditure or where such expenditure is paid to the same or related parties"*.

24.   I understand that Kirwan paid Akin Gump ▮▮▮▮▮▮▮▮▮ in three instalments, namely ▮▮▮▮▮▮▮▮ on 30 December 2015 (for October and November invoices), ▮▮▮▮▮▮▮▮ on 19 January 2016 (for December 2015 invoice and a retainer of ▮▮▮▮▮▮▮▮ I note that on all three of the invoices, there is a reference, "Re: SECTION 1782 PROCEEDING", which I understand is a reference to the discovery proceedings by Godfrey et al against Messrs. Johnson and Deitz and VRCG.

25.   An English Court could interpret and apply the financial limits in the list of USRMs to the Akin Gump invoices in a number of ways. It seems to me unlikely that "each individual item of expenditure" would refer to each item of work done listed within an invoice. It may be contended that each of the Akin Gump invoices represents an item of expenditure, such that individually under the definition of "Operational Expenses", each invoice would not be found under English law to have breached the financial limit at (a). However, the definition is the "incurring of" Operational Expenses. In my view, the liability for work to be carried out by Akin Gump in respect of the discovery proceedings was incurred at the moment that the retainer was signed (assuming that the signatory had authority to do so, as to which see further below in respect of question 1.4.4). At the time that the liability was incurred, the amount of legal costs involved may not have been known, and therefore at that moment the costs may not have been

expected to breach any limit; I do not know the factual background in this regard. However, once the costs reached or were anticipated to reach the financial limit at (a), I would expect an English Court to find that the incurring of this expenditure became a Unanimous Reserved Shareholder Matter. Further and alternatively, I understand that the legal costs of dealing with the Dutch proceedings, to which the motion Akin Gump was instructed to assist upon relates, greatly exceed the limit at (b). On this basis, the incurring of these legal costs, along with other such legal costs, would have required Unanimous Required Shareholder Consent from the outset.

26. As regards question 1.4.3, on the basis of my answers to the previous question, it will have been a breach of the SHA for the Financing Shareholders to have engaged and paid Akin Gump without Unanimous Required Shareholder Consent. Clause 9.1 requires such consent to be obtained in respect of Unanimous Shareholder Reserved Matters, and Clause 6.3.9 requires each Shareholder to procure that the Director(s) appointed by it complies with Clause 9.1.

27. As regards question 1.4.4, I should note that the engagement letter is signed by Mr Emile du Toit, a class B manager of Kirwan. I have been referred to Article 8.11 of Kirwan's By-Laws, which provides that where there are different classes of managers, Kirwan will only be validly bound by the joint signature of one class A manager and one class B manager. However, I note that Article 8.11 proceeds to state that "in any event the Company will be validly bound by the sole signature of any person or persons to whom such signatory powers shall have been delegated by any one of the managers or, in the event of classes of managers, by one (1) class A manager and one (1) class B manager acting together". I am unaware of whether or not Mr du Toit was delegated by a class A manager to sign on his behalf; also, the Articles are governed by Luxembourg law, and the engagement of Akin Gump is presumably under New York law. Accordingly, I am unable to comment further on whether the engagement of Akin Gump was entered into with a person with sufficient authority to do so vis-à-vis third parties. However, if there was a lack of proper delegation to Mr du Toit to sign on behalf of Kirwan, this would amount in my view to a breach of the By-Laws of Kirwan and correspondingly a breach of Clause 6.1 of the SHA.

15

28.   Further, it appears that the incurring of this expenditure was not approved by the Board of Kirwan, which under clause 6.3.3 of the SHA will have required a quorum of at least one A and one B director and also, for an Operational Expense requiring Unanimous Required Shareholder Consent, the C director. This would potentially constitute a breach of the By-Laws of Kirwan under Luxembourg law (although this is outside my expertise), a breach of Clause 6.3.3 of the SHA and a breach of Clause 6.1 of the SHA.

**Payment to Mandel Bhandari LLP**

1.5   **Did the entry into the Settlement, Cooperation and Retainer Agreement of 6 November 2015 ("SCRA") and payment of Mandel Bhandari LLP ("Bhandari") by Kirwan constitute a breach of the SHA by the Financing Shareholders? Please consider the following sub-questions:**

1.5.1   **Was payment of Bhandari invoices by Kirwan for representation of Feldman under the Settlement, Cooperation and Retainer Agreement of 6 November 2015 ("Settlement Agreement") an Operational Expense as a matter of the SHA?**

1.5.2   **Was Kirwan entering into the SCRA and paying Bhandari's invoices thereunder a Unanimous Shareholder Reserved Matter (that required a Unanimous Required Shareholder Consent)?**

1.5.3   **Was it a breach of the SHA by the Financing Shareholders (clauses 5.5.4, 6.1, 6.3.9, 9.1) that Kirwan entered into the Settlement Agreement and paid Bhandari thereunder without a Unanimous Required Shareholder Consent?**

1.5.4   **Was it also a breach of the SHA (clause 6.1) by the Financing Shareholders that Kirwan entered into the Settlement Agreement and paid Bhandari without the same being approved by the Board (board of managers of Kirwan)?**

29.   The representation of Mr Feldman under the Settlement Agreement appears from ███████

████████████████████████████████████████████████

███████████████████████████████████. There are not many further
details regarding the nature of these proceedings but in my view it is apparent from the
names of the parties involved that this is not an item of expense falling under item (i) of
the definition of "Operational Expenses" by reference to the definition of "Claims". I
cannot be sure as to whether the legal costs of Mr Feldman's representation would fall
within item (iv) of the definition of "Operational Expenses" without further information
regarding the nature of the proceedings, but it would seem unlikely that these costs
were incurred in connection with asserting legal title to the shares in Yukos Finance BV
as the parties involved do not include PNS or Kirwan nor any representative of the
same.

30.   As regards question 1.5.2, on the basis that the legal costs incurred on behalf of Mr
Feldman with Mandel Bhandari LLP were not "Operational Expenses", I consider that
they would fall within the first bullet point in the list of Unanimous Shareholder
Reserved Matters at Part 3 of Schedule 3 of the SHA. This provides, *"Expenditure by
the Financing Shareholders or any Group Company over and above that reasonably
required to meet Operational Expenses"*. Accordingly, in my view Unanimous
Required Shareholder Consent would have been required to enter into this engagement.
Correspondingly, as regards question 1.5.3, in my view it will have been a breach of the
SHA for the Financing Shareholders to have engaged and paid Mandel Bhandari LLP
without Unanimous Required Shareholder Consent; see further my response to question
1.4.3 above along similar lines. If, *ex arguendo*, the legal costs incurred on behalf of
Mr. Feldman were an Operational Expense, incurring such expense would still require a
unanimous consent of all shareholders of Kirwan because under the Settlement
Agreement Kirwan ████████████████████████████████████████
████████████████████████████████████████████
████████████████ which was well above the $250,000 threshold in respect of an
individual item of expenditure.

31.   As regards question 1.5.4, please see my response to question 1.4.4 above, which
applies equally to the incurring of the expenditure with Mandel Bhandari LLP.

*Payment of Return to the Financing Shareholders*

1.6   Would payments under the loan agreements (loan agreements funding Cash Call notices and Loans) constitute payments of Return to the Financing Shareholders, as a matter of the SHA?

1.7   Does the SHA make payment of any Return by Kirwan to the Financing Shareholders, likewise payment under any of the loans (loan agreements funding Cash Call notices and Loans) to them, subject to prior satisfaction of the rights of the C Shareholder or a Unanimous Required Shareholder Consent?

1.8   If so, could the Financing Shareholders have demanded repayment of the loans as they had done so in their joint loan repayment letter of 15 March 2016?

1.9   Does the issue as to whether or not the Financing Shareholders can demand repayment of the Loans and loans funding Cash Call Notices, as a matter of clauses 9.1, 11.3 and 12.1 and Part 3 of Schedule 3 of the SHA, fall within the scope of clause 25 of the SHA and are subject to arbitration under the LCI rules in case of a Dispute?

32.   As regards question 1.6, a "Return" means *"any payment of capital or income (or any other agreement or arrangement that involves any payment or transfer of rights or economic benefit to a Financing Shareholder or its Affiliate) by or on behalf of any Group Company to a Financing Shareholder or its Affiliate, including without limitation payment by way of dividend, repurchase of Shares, interest, or a distribution made on the winding-up of the Company"*.

33.   The definition of "Return" is very wide and includes not only capital payments but *"any other agreement or arrangement that involves any payment or transfer of rights or economic benefit"* to a Financing Shareholder by any Group Company. In my view, on a proper construction of the clause, the English Court would be likely to conclude that this would include repayments in respect of both the Loans and the loans funding Cash Call Notices. This is also supported by the formula for calculation of a Net Gain in Schedule 4 of the SHA. This provides for deduction of *"all capital contributions paid to the Company by the Financing Shareholders, including without limitation the*

18

*subscription monies paid pursuant to Clause 2, the Loans (exclusive of interest) and all Cash Calls met pursuant to Clause 10".* This makes clear that the Loans (though not interest on the Loans) and the Cash Calls amount to capital contributions.

34.    Returning to the definition of "Return", it is expressly provided in the definition of "Return" that this includes dividends, repurchases of Shares, interest, or a distribution on winding up. The reference to interest can only be a reference to interest on a debt, which would include interest on the Loans and the loans funding Cash Call Notices. Accordingly, in my view an English Court would find that repayments of capital owed on the Loans and the loans funding Cash Calls, and also interest on those Loans/Cash Calls, would constitute payments of Return to the Financing Shareholders.

35.    As regards question 1.7, pursuant to Clauses 11.3, 12.1 and 12.5 of the SHA, a payment of Return to the Financing Shareholders may only take place subject to satisfaction of the rights of the C Shareholder under Clause 12. Clause 12 sets out the "C Shareholder Earn-Out", which involves a process at Clause 12.1 to 12.4 for calculation of the Net Gain by reference to the principles in Schedule 4, and an obligation under Clause 12.5 requiring payment of 10% of the Net Gain by the Financing Shareholders to the C Shareholder. As a Return may not be paid until the Net Gain has been calculated and 10% of the Net Gain has been paid to the C Shareholder, in my view an English Court would find that the intention under the SHA is that no payments should be made to the Financing Shareholders at all until the C Shareholder's rights to his earn-out have been satisfied.

36.    As regards question 1.8, for the reasons set out above in response to question 1.6, the demand by the Financing Shareholders for repayment of the loans by their joint letter dated 15 March 2016 is a request for monies that would amount to a "Return". As there is no suggestion that any satisfaction of the C Shareholder's rights under Clause 12 has taken place, it is my view that as a matter of English law, the repayment of the loans in response to the Financing Shareholders' Demand would amount to a breach of the SHA by Kirwan. In seeking repayment of the loans by Kirwan, the Financing Shareholders would therefore be attempting to induce a breach of Kirwan's contractual obligations to

the C Shareholder under the SHA. If this was their intention, it would amount to a tort in English law.

37.   It is also apparent from the joint letter dated 15 March 2016 that the Financing Shareholders contend that they are entitled to seek repayment of the loans by reason of a discretion under the terms of the loans to demand repayment when an insolvency event takes place. This entitlement is addressed in relation to subsequent questions. However, even if the Financing Shareholders have a legal right under the terms of the loans to seek repayment, exercise of that legal right is qualified by the terms of the SHA, in relation to the seeking of a Return, and compliance with the terms of the loans:

(a)   The Financing Shareholders will have known that requiring the loans to be repaid in circumstances where the parties to the SHA had not achieved their mutual aim of asserting title to Yukos Oil would inevitably lead to the insolvency of Kirwan. Under Part 3 of Schedule 3, the list of Unanimous Shareholder Reserved Matters includes *"Any decisions which would result in the Company's liquidation, placing into receivership or administration of the Company"*. Under Clause 9.1.1 the parties to the SHA agree that that no action or decision shall be taken (whether by the Shareholders, the Board, the Promnefstroy General Director, the Promneftstroy Management Committee, the company, any other member of the Group or any of the directors, officers or managers of the Group) or resolution passed relating to any Unanimous Shareholder Reserved Matters without Unanimous Required Shareholder Consent. The Financing Shareholders did not obtain the consent of all of the shareholders before taking the decision to declare an insolvency event and demanding repayment of the various loans. Accordingly, I consider that an English court would find that the Financing Shareholders are in breach of Clause 9.1.1.

(b)   Under Clause 5.6 of the SHA the Financing Shareholders *"shall procure that the Company complies with the terms of the Loans"*. In my view an English Court would find that by exercising a legal right (if such exists) for repayment of the Loans in circumstances where the Financing Shareholders have knowledge that the Company is not in a position to repay the Loans, the Financing Shareholders are failing to procure that the Company complies with the terms of the Loans and

20

are in breach of the SHA. Clause 5.6 also contains an agreement by the Financing Shareholders "to waive any remedies that they may have in relation to any non-payment or non-performance by the Company thereunder [i.e. under the terms of the Loans]". See further below the responses in relation to question 1.10.

38.   As regards question 1.9, Clause 25 of the SHA provides:

*"If any dispute, controversy or claim between the Parties arises out of or in connection with this Agreement including any question regarding its existence, breach, termination or invalidity ("Dispute") they shall use all reasonable endeavours to resolve the Dispute amicably. If the Parties are unable to resolve the Dispute, then the Dispute shall be referred to and finally resolved by arbitration under the LCIA Rules which Rules are deemed to be incorporated by reference into this Clause 25. The place of arbitration shall be London, England and there shall be one (1) arbitrator, to be appointed by the LCIA Court. The language of the arbitration shall be English. Any arbitral award pursuant to this Clause shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including all arbitration costs, reasonable attorneys' fees and disbursements, to be made on the basis that the losing Part(y)(ies) shall pay the costs of the successful Party(y)(ies).".*

39.   It is normally only appropriate to commence arbitral proceedings once a dispute has arisen between the parties. The English Courts have considered the meaning of a "dispute" in relation to whether a matter is ripe for arbitration, having regard to clauses such as Clause 25 which refer to "disputes" or "differences" being referred to arbitration, in the context of when time has started running for the purposes of a statutory or contractual time limit. It has also arisen in the context of applications to stay court proceedings, including anti-suit injunctions in relation to foreign court proceedings, due to the existence of an arbitration agreement. The argument in the latter situation has usually been that no stay is necessary if there is no dispute between the parties to be referred to arbitration because the claim is unanswerable. This argument has been firmly rejected and a claim that has not been admitted gives rise to a dispute however unanswerable that claim is said to be[10].

---

[10] *Halki Shipping Corp v Sopex Oils Ltd (The "Halki")* [1998] 1 Lloyd's Rep. 465; Appendix 10. Affirmed in *Salford Estates (No. 2) Ltd v Altomart Ltd* [2015] Ch 589; Appendix 11.

40.   In my view there can be little doubt that, as regards the issue as to whether or not the
Financing Shareholders can demand repayment of the Loans and loans funding Cash
Call Notices, an English Court would find there is a "dispute, controversy or claim"
between the parties arising out of or in connection with the SHA. I understand that it
has been suggested that the motion before the U.S. Court is an issue between the
Financing Shareholders and Kirwan under the loan agreements and therefore Mr Lynch
may not intervene[11]. In my view this does not take account of the contention that the
demand has given rise to a dispute under the SHA. In my view an English Court would
look at the substance of the dispute, and given the nature of the joint venture between
the Shareholders, the manner in which funding by way of loans has been provided to
Kirwan, the terms of the SHA relating to the Loans and the Cash Call funding and the
rights of the C Shareholder under the SHA, in particular Clause 12, would find that
there is an arbitrable dispute under the SHA as a result of the demand for repayment of
the Loans and Cash Call Loans.

*Waiver of remedies against Kirwan in relation to the Loans (clause 5.6)*

**1.10 Does the bringing of the insolvency petition by the Financing Shareholders in
relation to the Loans breach clause 5.6 of the SHA, especially in light of the
undertaking by the Financing Shareholders to procure compliance with the Loans
by Kirwan? Please consider the following sub-questions:**

**1.10.1 What is the meaning of the undertaking by the financing Shareholders to
procure compliance by Kirwan with the terms of the Loans? Can it mean
that if the Loans are to be repaid the Financing Shareholders have to lend
funds to Kirwan to enable it to repay the loans?**

**1.10.2 Have the Financing Shareholders waived <u>any</u> remedy against Kirwan in
relation to its non-payment or non-performance under the loan on the
plain meaning of clause 5.6?**

---

[11] Objection of Petitioning Creditors at ¶ 55.

22

1.10.3  **Does the plain meaning of clause 5.6 produce an absurd result given other provisions of the SHA, including in relation to the payment of Returns to the Financing Shareholders and timeless duration of the SHA, and the fact that while negotiating the SHA its parties considered the "waiver of the Loans" and sought Luxembourg counsel tax advice in relation to it?**

1.10.4  **Can the parties to a contract under English law waive a remedy to bring an insolvency petition?**

41.    Clause 5.6 of the SHA provides:

*"The Financing Shareholders shall procure that the company complies with the terms of the Loans, and agree to waive any remedies that they may have in relation to any non-payment or non-performance by the Company thereunder".*

42.    The term "procure" in its ordinary meaning is to obtain, persuade and/or cause. In other words, it means to make something happen. It is notable that the wording of the clause is not couched in language of "using reasonable endeavours to" or other such qualifying language; it is an absolute obligation upon the Financing Shareholders. It is significant that the Financing Shareholders are the counterparties to the Loan agreements, being the creditors of Kirwan, and yet have an obligation under the SHA to cause the company to comply with the terms of the Loan agreements. This is coupled with a waiver of "any remedies" that they may have in relation to non-payment or non-performance by the Company of the Loan agreements. On its plain meaning, this is an unambiguous waiver of the Financing Shareholders' rights to seek a remedy of any kind in relation to non-payment or non-performance of the Loans.

43.    Furthermore, I would note that the Loan agreements do not contain "entire agreement" clauses which would preclude consideration of pre-contractual representations or undertakings. I consider that an English Court would view Clause 5.6 of the SHA as a collateral undertaking. The terms of a collateral contract may override conflicting terms in the main written contract. See ***City & Westminster Properties v Mudd***[12], where a

---

[12] [1959] 1 Ch 129; Appendix 12.

23

promise was made prior to the entry into a contract for the lease of a shop that the landlord would not enforce a covenant in the lease against the tenant preventing him from living in the premises, the landlord was held to the terms of the collateral promise on which the tenant had relied:

"This is not a case of a representation made after contractual relations existed between the parties to the effect that one party to the contract would not rely on his rights. ...It is a case of a promise made to [the defendant] that, he would execute it in the form put before him, the landlord would not seek to enforce against him personally the covenant about using the property as a shop only. The defendant says that it was in reliance on this promise that he executed the lease and entered on the onerous obligations contained in it. He says, moreover, that but for the promise made he would not have executed the lease, but would have moved to other premises available to him at the time. If these be the facts, there was a clear contract acted upon by the defendant to his detriment and from which the plaintiffs cannot be allowed to resile... The promise was that so long as the defendant personally was tenant, so long would the landlords forbear to exercise the rights which they would have if he signed the lease."

44.   See also **_Brikom Investments v Carr_**[13] in respect of collateral contracts and promissory estoppel, and the dictum of Lord Denning **_in J Evans & Son (Portsmouth) Ltd v Andrea Merzario Ltd_**[14]: *"When a person gives a promise or assurance to another, intending that he should act on it by entering into a contract, and does act on it by entering into the contract, we should hold that it is binding"*.

45.   I understand that it is being suggested that a full waiver of the remedies available to a creditor cannot be accepted as the meaning of Clause 5.6, and that this would lead to absurd results. However, in my view the English Court is likely to take into account the following factors which would lend support to the plain meaning of the wording of the clause, bearing in mind also the principles set out in **_Arnold v Britton_**[15] outlined above regarding the extent to which commercial common sense should be invoked:

(1) The Financing Shareholders are both the creditors under the Loan agreements and also the majority shareholders of the Company. They are therefore "internal"

---

[13] [1979] 1 QB 467; Appendix 13.
[14] [1976] 1 WLR 1078 at p. 1081; Appendix 14.
[15] [2015] AC 1619; Appendix 5.

creditors rather than arms-length third party creditors, who may have good reason to be prepared to waive any remedy for non-payment or non-performance.

(2) The payments to the Company under the Loan agreements are a form of capital contribution, as indicated by the provisions relating to Subscription (Clause 2), the definition of "Return", and the calculation of "Net Gain". As such, it would seem likely that the Financing Shareholders were contributing equity to the Company, and were not expecting repayment unless and until their investment paid off.

(3) The SHA only allows the Financing Shareholders to pay themselves a Return, including payment in respect of the Loans, once the C Shareholder's rights are satisfied, which is dependent upon the receipt of 10% of the Net Gain. Therefore it is at the point at which the investment pays off that the Financing Shareholders expected to be able to receive repayment.

(4) Under Clause 3, after the C Shareholder's rights have been satisfied, the C Share is to be cancelled immediately. At that point, the Financing Shareholders would be in full control of the Company, and would be able to lay claim to the assets of the Company, whether that be by liquidating the Company or paying themselves a Return.

(5) Under the terms of the SHA, there was no intention for the loans to be repaid unless and until the Shareholders achieved the aim set out in clause 5.3 and procured the fulfilment of clause 4.3.1.

46.    As regards the question 1.10.4 of whether or not a party to a contract under English law may waive a remedy to bring an insolvency petition, there are suggestions in the case law that an insolvency petition is not itself a claim against the company in respect of a debt; rather, the creditor seeks an order that will enable the creditor to prove its debt in the liquidation. Even if the correct position is that bringing an insolvency petition in itself is not a remedy, where the remedy of seeking repayment of a debt has been waived, I consider that an English Court would not grant an insolvency petition based upon that debt, as it would clearly be a genuinely disputed debt[16].

---

[16] In *Salford Estates* itself, the petition was stayed to compel the parties to resolve the matter through arbitration as their agreed method of dispute resolution. This is discussed further at paragraph 50 below.

47. I would note also that under Part 3 of Schedule 3 of the SHA, the Unanimous Shareholder Reserved Matters include "any decisions which would result in the Company's liquidation, placing into receivership or administration of the Company". In my view an English Court would find that this included a decision of the Financing Shareholders to bring an insolvency petition, and that failure to obtain Unanimous Required Shareholder Consent would be a breach of clause 9.1.3 as set out above. In my view, the English Court would not be impressed by the suggestion that the Financing Shareholders were acting in the capacity of creditors, not shareholders; the English Court would consider the substance, not the form, of the matter and an attempt to avoid the terms of the SHA requiring unanimous consent for such a step would be unsuccessful.

**1.11 Does the issue as to whether or not the Financing Shareholders can bring an insolvency petition with respect to non-payment of the Loans by Kirwan, as a matter of clause 5.6 of the SHA, fall within the scope of clause 25 of the SHA and are subject to arbitration under the LCIA rules in case of a Dispute?**

48. Under section 9 of the Arbitration Act 1996[17]:

"(1)  *A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.*

   ...

"(4)  *On an application under this section the court shall grant a stay unless satisfied that the arbitration agreement is null and void, inoperative, or incapable of being performed.*"

49. In relation to winding-up petitions, under English law a petitioning creditor may obtain a winding-up order if able to prove, among other matters, that the company is unable to

---

[17] Appendix 15.

pay its debts as they fall due[18]. In relying upon a particular debt as evidence of insolvency, it is an abuse of process for a petitioning creditor to pursue a winding-up petition if the debt is genuinely/*bona fide* disputed on substantial grounds. The English Court has a discretion to dismiss a petition in those circumstances. However, where there is a dispute regarding the debt which falls within an arbitration clause, the jurisdiction of the court may be excluded in favour of arbitration as regards that dispute.

50.    There are a number of recent cases in which an English Court has dismissed or stayed a winding-up petition (the equivalent of a U.S. motion for insolvency) by a creditor in favour of an arbitration agreement. In ***Salford Estates (No.2) Ltd v Altomart Ltd***[19] it was held that the discretionary power in section 122(1) of the Insolvency Act 1986 to wind up a company had to be exercised consistently with the parties' agreement as to the proper forum for the resolution of disputes between them and with the legislative policy of the Arbitration Act 1996; that the fact that a debt was not admitted was sufficient to constitute a dispute for the purposes of the 1996 Act, irrespective of the merits of any defence; and that, accordingly, rather than investigating whether the petition debt was *bona fide* disputed on substantial grounds, it was right to dismiss or stay the petition to compel the parties to resolve their dispute in accordance with their chosen method.

51.    This approach was followed in ***In the matter of Eco Measure Market Exchange Ltd sub nom Eco Measure Market Exchange Ltd v Quantum Climate Services Ltd***[20] in which the English Court held that it was appropriate to dismiss a winding-up petition where the debt on which the petition was based arose out of a contract containing an arbitration agreement. The company against whom the petition was brought was entitled to have the petition dismissed and to have the dispute referred to an arbitrator without having to show (as per the usual requirement) that the debt claimed was bona fide disputed on substantial grounds.

---

[18] See s. 122(1)(f) of the Insolvency Act 1986; Appendix 16.
[19] [2015] Ch 589; Appendix 11.
[20] [2015] EWHC 1797; Appendix 17.

52.   A similar issue has arisen in relation to the jurisdiction of the Court to consider unfair prejudice petitions under section 994 of the Companies Act 2006[21] by minority shareholders in relation to the abuse of power by majority shareholders, where there is an arbitration agreement. In unfair prejudice petitions, the forms of relief available include ordering the majority shareholders to acquire the minority's shares, or winding-up of the company. It seems clear that the parties' choice of arbitration as their form of dispute resolution will be given primacy in respect of the scope and substance of the dispute. It may be that the relief sought (such as a winding-up order) might ultimately be a matter which requires the exercise of the statutory powers of the Court, but there is nothing in principle objectionable to arbitrators having the power to determine whether or not grounds exist for winding up[22].

53.   Accordingly, in my view, given that Mr Lynch has made allegations that there are breaches of the SHA which mean that the alleged debts on which the motion for insolvency are founded are disputed, those allegations would be referred by an English Court to arbitration under Clause 25 of the SHA.

54.   I note that there has been a suggestion that privity is a bar to Mr Lynch contesting the repayment of the loans. However, in my view this ignores the alleged breaches of the SHA that the demand for repayment of the loans entails, in respect of which Mr Lynch has no such bar.

**Parties undertaking not to interfere with PNS' acquisition of Yukos Finance BV**

1.12 **Does any of the following constitute a breach by the Financing Shareholders of their undertaking in clause 5.4 of the SHA not to take any actions that will interfere with the actions, steps and proceedings to be taken by PNS with a view to ensuring that it acquires legal registered title to the entire issued share capital of Yukos Finance BV:**

  1.12.1 **the Financing Shareholders' demand for repayment of the loans (Loans and loans funding Cash Call Notices);**

---

[21] Appendix 18.
[22] *Fulham Football Club (1987) Ltd v Richards* [2011] EWCA Civ 855; Appendix 19.

1.12.2 an attempt by the Financing Shareholders to settle the litigation over the title to the Yukos Finance Shares through the US bankruptcy proceedings by imposing a settlement on PNS whereby in consideration of US$ 137,500,000 PNS abandons its pursuit of legal registered title to the Yukos Finance shares?

55.    Clause 5.4 of the SHA provides:

*"the Parties shall procure that Promneftstroy, subject to being put in funds pursuant to Clauess 4.2.1 and 10, takes all actions, steps and proceedings legally available to it with a view to ensuring that it acquires legal registered title to the entire issued share capital of Yukos Finance BV as soon as reasonably practicable following the payment of the Auction Price and that all actions set out in the Yukos Finance BV Restructuring document are taken in accordance with the timetable set out in that document (provided that such document has been initialled by all Shareholders)"*.

56.    The obligation in Clause 5.4 is upon all the Parties to procure (i.e. cause or obtain) PNS to take the necessary steps to acquire the legal registered title to the Yukos Finance Shares.

57.    As a demand for repayment of the Loans and Cash Call Loans could not be met at this time, and furthermore a motion to wind up the company would stop Kirwan/PNS from pursuing the title to the Shares, it does seem to me that such a demand and motion would mean that the Financial Shareholders would be interfering with PNS' ability to take all steps available to it to acquire the title to the Shares. I would note that the parties to the SHA have not included any "exit provisions" that provide for this situation; to the contrary, the Financing Shareholders have waived their remedies for non-performance or non-payment of the Loans, and have agreed that no Return shall be paid to them prior to satisfaction of the C Shareholder's rights under clause 12. Equally, an attempt to settle the litigation by two of the shareholders which involves abandoning PNS' claim to legal title to the Shares does appear to me to affect the ability of PNS to claim such title.

29

Shareholders and the SHA

**1.13  Does the Shareholders Agreement bind the Shareholders (of Kirwan) only in their capacity as Kirwan's shareholders or does it bind them in their personal capacity?**

58.    In my view, unless there is clear provision to the contrary, there is no reason to treat the capacity of parties to a shareholders' agreement as limited to their capacity as shareholders. I have found no cases on this point as such, but I consider that as a matter of general principle under English law, contracting parties to an agreement are bound in their full capacity unless otherwise expressly agreed. Insofar as a shareholder is also a creditor, his actions as a creditor may be permitted under the loan agreement but may also place him in breach of his obligations under an SHA; there is no "ringfencing" or protection as a creditor from obligations freely entered into under an SHA. In my view and English Court would consider this to be particularly inapt in the present case given the obligations on the Shareholders (a) not to take decisions that would place the Company in liquidation without unanimous Shareholder Consent and (b) to procure compliance by the Company with the Loans; see my responses above at paragraphs 41 to 44.

59.    I understand that the Petitioners/Financing Shareholders contend that they are not raising any issues regarding the agreement's "existence, breach, termination or invalidity", and that under English law, the arbitration clause does not apply to insolvency proceedings. Please see my response to question 1.11 above. Further, even if the Financing Shareholders do not consider that there are any issues regarding the SHA's "existence, breach, termination or invalidity", it is clear that the C Shareholder is alleging that their actions do amount to breaches of the SHA. In my view an English Court would treat those allegations as within the arbitrator's jurisdiction, and would stay or dismiss the insolvency proceedings pending determination of those allegations by the arbitrator; this was the approach adopted in ***Salford Estates***[23], as described above at paragraph 50.

---

[23] [2015] Ch 589; Appendix 11.

## 2.    LOAN AGREEMENTS

*Law applicable to the determination of the "insolvency event"*

**2.1    Is the expression "insolvency event" in clause 5 of the loan agreements to be interpreted in accordance with English law or Luxembourg law?**

60.    The agreements in respect of the Loans and also the loan agreements in response to Cash Call Notices in 2007 to 2012 ("the Agreements") all provide that English law is the applicable law of the contract.

61.    All of the Agreements contain an LCIA Arbitration clause with the seat of arbitration in London, England. An LCIA tribunal seated in England would apply the same conflict of laws rules as an English Court. Accordingly, I will respond to this question as if it were to arise in a dispute regarding the Agreements before an English Court applying English conflict of laws rules, namely, what would be the applicable law in respect of the expression "insolvency event".

62.    When looking at the *lex causae* or applicable law in a case involving a foreign element, it is "first necessary to characterise the issue that is before the court"; *Macmillan v Bishopsgate (No. 3)*[24]. In Member States of the European Union, of which the United Kingdom is one, the applicable law rules set out in the Rome I Regulation (593/2008)[25] *"shall apply, in situations involving a conflict of laws, to contractual obligations in civil and commercial matters"*. In order for Rome I to apply, the parties need not have any EU connection – all that is required is that the case is raised in a Court in a Member State which raises a choice of law issue in subject matter that falls within the Regulation. Any law may be specified as the applicable law of the contract, whether or not it is the law of an EU Member State.

63.    Under Article 3(1) of Rome I, freedom of choice is given primacy, subject to limits on the scope of the Regulation, and certain other provisions of the Regulation for particular types of contract (such as insurance contracts, or employment contracts):

---

[24] [1996] 1 WLR 387, per Staughton LJ at 391; Appendix 20.
[25] Appendix 21.

*"A contract shall be governed by the law chosen by the parties. The choice shall be made expressly or clearly demonstrated by the terms of the contract or the circumstances of the case. By their choice the parties can select the law applicable to the whole or to part only of the contract".*

64.    However, there is a series of exclusions from the scope of the Rome I Regulation at Article 1(2), including, at paragraph (f):

*"questions governed by the law of companies and other bodies, corporate or unincorporated, such as the creation, by registration or otherwise, legal capacity, internal organisation or winding-up of companies and other bodies, corporate or unincorporated, and the personal liability of officers and members as such for the obligations of the company or body".*

65.    The Guiliano-Lagarde Report[26], which provided guidance as to the interpretation of Article 1(2)(e) of the Rome Convention (which the predecessor to and was worded identically to Article 1(2)(f) of Rome I), emphasised that the exclusionary rule at 1(2)(e) had been made "flexible" in order to take account of the diversity of national laws relating to companies, firms and other bodies. The Report states:

*"[the exclusion] affects all the complex acts (contractual, administrative, registration) which are necessary to the creation of a company or firm and to the regulation of its internal organization and winding up, i.e. acts which fall within the scope of company law".*

66.    As regards "internal organization", the Report provides a number of examples, including *"the calling of meetings, the right to vote, the necessary quorum, the appointment of officers of the company or firm, etc. "Winding-up" would cover either the termination of the company or firm as provided by its constitution or by operation of law, or its disappearance by merger or other similar process".*

---

[26] Available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:31980Y1031(01):EN:HTML.

67. As set out in the Guiliano-Lagarde report, the exclusion from Rome I for "winding-up" refers to the "termination of the company or firm as provided by its constitution or by operation of law". In my view this would refer to questions as to whether or not a company's existence has been terminated; the question of a company's existence is to be answered by reference to the company's Articles, and the law of incorporation of that company, as to whether that company has been wound up.

68. However, in relation to the meaning of an "insolvency event", this may or may not raise questions as to the termination of the company. For example, if a company goes into administration, it may be insolvent but it may not be wound up; it may continue as a going concern.

69. Accordingly, in my view an English Court would find that the meaning of an "insolvency event" does not necessarily or entirely fall within the exclusion in Rome I. Accordingly it would be construed in accordance with the parties' choice of law, namely English law. Having said this, insofar as an "insolvency event" refers to a formal act to terminate the company's existence, the English court would have to have regard to the systems of law applicable to the company in order to decide whether such an act has taken place in relation to Kirwan.

70. In considering this question I have had regard to the case of ***Strategic Value Master Fund Ltd v Ideal Standard International Acquisition S.A.R.L. and others***[27]. In that case, the relevant clause related to a Luxembourg company and the operative words were: "[the company] is, or is deemed for the purposes of any applicable law to be, unable to pay its debts as they fall due or insolvent". The question was whether the test for "insolvency" was governed by English law, being the governing law of the contract, and therefore an "applicable law". The court held that the words "any applicable law" meant "the law that is applicable to the company in question" and that this will be, in the first place, the law of its place of incorporation, and in addition, the law of any other jurisdiction which has the power to wind it up. Therefore English law was held not to be the applicable law to the test for insolvency.

---

[27] [2011] EWHC 171; Appendix 22.

33

71.   I would note that the *__Strategic Value__*[28] case was a case at first instance and therefore it would not be binding authority before another Judge in the English High Court. Further, it does not appear, surprisingly, that any reference was made in the judgment to Rome I, or to the scope of the exclusion. I would respectfully disagree with the judgment at paragraph 47 that "whether a company is, or is deemed to be, insolvent is to be determined according to the system or systems of law relevant to that company". In any event, the clause in *__Strategic Value__*[29] is different to the clause in the Loan Agreements, as it referred to "any applicable law", which the Court considered meant the law applicable to the company in question.

72.   In summary, in my view the issue of whether a company has been wound up, or terminated, falls outside Rome I and is to be determined in accordance with the systems of law applicable to that company; but whether or not an "insolvency event" has occurred __may__ be wider than this. To the extent that the matter falls within Rome I, I consider that an English Court would respect the parties' agreement that the applicable law is to be that of English law.

*Interpretation of the "insolvency event"*

**2.2    On the assumption that the "insolvency event" is to be construed under English law, how is it to be interpreted?**

73.   For the purposes of this question, I will not have regard to the discretionary wording in respect of the Lender in clause 5 of the loan agreements.

74.   The term "insolvency event" is not defined in the loan agreements and therefore the parties have not specified the events which would amount to an "insolvency event" for the purposes of the clause.

75.   The words "insolvency event" appear in a number of statutes, which have a particular definition of the words for the purposes of those statutes. The statutes tend to refer to a

---

[28] [2011] EWHC 171; Appendix 22.
[29] [2011] EWHC 171; Appendix 22.

34

formal step or event such as a winding-up order or a resolution by the company to enter into administration[30].

76.    I have reviewed a large number of English cases in Westlaw[31] with a view to determining whether "insolvency event" is a term of art which imports a generally understood meaning into a contract, particularly in finance agreements. From my review, it appears that the words "insolvency event" are used in contracts in a myriad of different ways, depending upon the wording agreed upon by the parties in the particular case. However, there is a pattern of requiring some formal process of winding up or going into administration to have taken place. By way of examples:

(1)    In **_Kaupthing Singer & Friedlander Limited (in administration)_**[32], the events of default in relation to performance bonds falling due included the "Insolvency of the Issuer", which was defined solely in terms of winding up of the company by resolution or court order[33];

---

[30] See for example under section 121 of the Pensions Act 2004; Appendix 23. An insolvency event occurs in relation to a company where–
"(a) the nominee in relation to a proposal for a voluntary arrangement under Part 1 of the Insolvency Act 1986 submits a report to the court under section 2 of that Act (procedure where nominee is not the liquidator or administrator) which states that in his opinion meetings of the company and its creditors should be summoned to consider the proposal;
(b) the directors of the company file (or in Scotland lodge) with the court documents and statements in accordance with paragraph 7(1) of Schedule A1 to that Act (moratorium where directors propose voluntary arrangement);
(c) an administrative receiver within the meaning of section 251 of that Act is appointed in relation to the company;
(d) the company enters administration within the meaning of paragraph 1(2)(b) of Schedule B1 to that Act;
(e) a resolution is passed for a voluntary winding up of the company without a declaration of solvency under section 89 of that Act;
(f) a meeting of creditors is held in relation to the company under section 95 of that Act (creditors' meeting which has the effect of converting a members' voluntary winding up into a creditors' voluntary winding up);
(g) an order for the winding up of the company is made by the court under Part 4 or 5 of that Act."
[31] A search for cases referring to "insolvency event" in Westlaw produced 128 results, which I have reviewed.
[32] [2010] EWHC 316; Appendix 24.
[33] "(a) If an effective resolution is passed, or an order of a court of competent jurisdiction is made, for the Insolvency of the Issuer (otherwise than for the purposes of a consolidation, amalgamation, merger or reconstruction the terms of which have previously been approved in writing by an Extraordinary Resolution of the Bondholders) (an "Insolvency Event"), the Trustee may, subject as set out in paragraph (d) below, give written notice to the Issuer that the Bonds are, and they shall thereby forthwith become, subject to Condition 2, immediately due and repayable at their principal amount together with accrued interest as provided in the Trust Deed."

(2) In ***The Commissioners for Her Majesty's Revenue and Customs v The Football
League Ltd***[34], a case involving creditors of football clubs, the "insolvency event"
under the Articles of Association of the Football League Limited regarding
insolvency of a member club was defined by reference to taking of the following
steps under the relevant insolvency statutes: (a) entering into a company voluntary
arrangement, scheme of arrangement with creditors, or compromise agreement with
creditors as a whole; (b) lodging a notice of intention to appoint an administrator, an
application for an administration order; (c) appointment of an administrative
receiver; (d) shareholders passing a resolution to voluntarily wind up; (e) convening
of a meeting of creditors; (g) a winding up order made by the Court or appointment
of a provisional liquidator; (g) ceasing or forming an intention to cease to carry on
business save for the purpose of reconstruction or amalgamation; (h) being subject
to any insolvency regime in any jurisdiction outside England and Wales analogous
to the foregoing insolvency regimes; (i) having any proceeding or step taken or any
court order in any jurisdiction made which has a substantially similar effect to any
of the foregoing.

(3) In ***MHMH Ltd v Carwood Barker Holdings Ltd***[35], the clause defining an
"insolvency event" referred to a resolution or petition for winding up, or
appointment of a receiver or administrator, or entering into an arrangement with its
creditors[36];

77. From the above, and also as a matter of ordinary interpretation of the words, in my
view an English Court would consider that unless otherwise agreed or provided for by
relevant legislation, an "insolvency event" connotes a specific event or occurrence,
rather than merely a "status" of being insolvent. A company may be described as
"insolvent" as an adjective, which under English law is likely to refer to one or more of
the tests under section 122 of the Insolvency Act 1986, namely that it is unable to pay
its debts as they fall due, or that it is insolvent under the "balance sheet" test (liabilities

---

[34] [2012] EWHC 1372; Appendix 25.
[35] [2004] EWHC 3174; Appendix 26.

[36] The relevant clause provided that the company *"... shall pass a resolution or have a petition granted against it
for the winding up of the Vendor or if a Receiver or Administrator of the Vendor is appointed or the Vendor
enters into any arrangement with its creditors (together an insolvency event) the Purchaser shall be forthwith
released from its obligation to make any further payments of consideration then unpaid."*

exceed assets), but based on the above cases I would not expect an English Court to find that this would amount to an "event" without express wording to this effect. I would therefore consider that an English Court would distinguish cases such as *TMT Asia Limited v Marine Trade S.A.*[37] in which the trigger for a default was that the company "becomes insolvent", from cases in which an "insolvency event" is required to occur.

78.  Since the words "insolvency event" are not a term of art and therefore ordinary principles of contractual interpretation apply to it, and given that the parties have not specified what it means, I consider that the lack of an agreed definition in the contract means that it is ambiguous. An English Court faced with this terminology could address the matter in any of the following ways:

(a) having regard to the business sense of the clause in the context of the contract as a whole, attempt to determine the intention of the parties in agreeing the clause, with regard to the principles set out at the beginning of this declaration; and/or

(b) construe the clause *contra proferentem*, which would suggest that it should be construed against the lenders, in a narrow sense. This would support a narrow definition that would require a formal event, such as an order granting a winding-up petition, or a resolution to enter into administration or liquidation.

(c) Alternatively, treat the clause as void for vagueness. I consider this is unlikely given the discretion given to the Lender, as addressed further below in respect of question 2.3.

79.  It is difficult to say what construction the English Court would place on "insolvency event", but I am inclined to consider that where the parties have not chosen to define the term, the English Court would be reluctant to interpret the clause as requiring repayment of the loans without a formal insolvency event occurring.

---

[37] [2011] EWHC 1327; Appendix 27.

**Financing Shareholders' discretion in relation to the insolvency event**

2.3   Does the expression "as determined by the Lender" in clause 5 of the loan agreements apply to:

2.3.1   what is an insolvency event as a matter of the loan agreements or

2.3.2   whether an insolvency event (determined objectively) has occurred?

80.   In my view, the English Court would consider that the wording "as determined by the Lender" is included in order to permit the Lender to define what events would amount to an insolvency event. It is quite unusual as the clause does not expressly require the Lender to list the events which amount to an "insolvency event", which means that the Borrower may not know what events would amount to an "insolvency event" unless and until the Lender chooses to invoke the clause.

81.   The Lender would be required to exercise its discretion as to what amounts to an insolvency event in good faith and within the bounds of reasonableness.

82.   As to whether or not an insolvency event has occurred, it seems to me that this is an objective question on the facts and not a matter which can be subjectively determined by the Lender. For example, if the Lender decided that the commencement of winding up proceedings by a third party creditor amounted to an insolvency event; this could not be a matter for subjective determination, but is a matter of objective fact. Equally, if the Lender were to decide that a general inability of the company to pay its debts to third parties when they fell due were to amount to an insolvency event, and assuming that this were to be a reasonable exercise of its discretion, it would still be a matter of provable, objective fact as to whether or not the company were so unable to pay its debts when they fell due. I consider that an English court would be reluctant to construe the clause as giving the Lender a wide discretion as to whether the relevant event had in fact occurred.

83.   I also consider that an English Court would be supported in this view by the position of the words "as determined by the Lender" within the sentence. Whilst this is not determinative, on an ordinary reading of the words, they refer to "insolvency event"

and not to "occurs". This suggests that the discretion refers to the meaning of "insolvency event" rather than whether or not such an event has occurred.

**2.4   Is the Financing Shareholders' exercise of discretion in determining that an insolvency event has occurred in circumstances when the Financing Shareholders decided not to fund Kirwan anymore but nonetheless allowed it (through the directors appointed by them and in breach of the SHA) to incur expense an abuse (lack of good faith, arbitrariness, capriciousness, perversity or irrationality)?**

84.   My understanding is that the Financing Shareholders allege that Kirwan is unable to pay its debts as they fall due because Kirwan has failed to pay Akin Gump legal fees incurred allegedly on its behalf.

85.   It is my understanding that MHL and LL control the Board of Kirwan, as Clause 6.2.2 of the SHA gives them the power to appoint all but one of the directors of Kirwan. Accordingly, MHL and LL have the power to ensure payment of legal fees incurred on behalf of Kirwan. The Board also has the power to require MHL and LL to fund the Operating Expenses of Kirwan through Cash Calls Notices; since MHL and LL control the Board, they control the exercise of this power.  It should be noted however that the Financing Shareholders' joint approval (Special Majority Required Shareholder Consent) is required for "service by the Board of a Cash Call Notice which, when aggregated with funds provided under any antecedent Cash Call Notices, would require total funding by the Financing Shareholders of more than US$10,000,000.  I understand that this limit was exceeded at some point in 2010.

86.   In those circumstances, reliance by the Financing Shareholders upon unpaid expenses which they have permitted Kirwan to incur, to prove that Kirwan is unable to pay its debts as they fall due, does appear to me to be contrived. This is particularly so where MHL and LL are the sole source of financing for Kirwan and will presumably have known, through their control of the Board and the Kirwan bank account, both the cash flow position of Kirwan and the extent of its indebtedness to any third party creditors.

87.   I would add that to the extent that it is proved that the directors appointed by MHL and LL incurred expenses on behalf of Kirwan which could not be funded by Kirwan unless

they exercised the power to issue a Cash Call Notice and/or the Financing Shareholders consented to fund those expenses, and they then failed to exercise that power or obtain such consent, I consider that an English Court would consider this to be a breach of the directors' fiduciary duties to Kirwan, and potentially also to the C Shareholder[38]. It may also be the case that the directors' decision to incur such expense would fall within the list of Unanimous Shareholder Reserved Matters in Part 3 of Schedule 3 of the SHA, as being decisions which would result in the Company's liquidation, and as such would mean that MHL and LL are in breach of Clauses 6.3.9 and 9.1 of the SHA regarding the requirement of unanimous shareholder consent for USRM matters.

2.5    **Is the Financing Shareholders' exercise of discretion in determining that an insolvency event has occurred in the following circumstances an abuse (lack of good faith, arbitrariness, capriciousness, perversity or irrationality):**

2.5.1    **PNS and Kirwan entered into a share purchase agreement in relation to the shares in Yukos Finance ("SPA") pursuant to which PNS agreed** ■

■    **the Financing Shareholders are well aware of this arrangement and of the fact that PNS was not supposed to repay the loans to Kirwan and that PNS will be able to transfer the Yukos Finance shares to Kirwan after an irrevocable decision of a Dutch court that such transfer will not violate any effective order or ruling of a Dutch court.**

88.    I have been provided with a copy of the Share Purchase Agreement dated 30 August 2010 between PNS and Kirwan. I understand that

---

[38] The Court of Appeal in *Elliott v Wheeldon* [1993] BCLC 53; Appendix 28, allowed a claimant shareholder/joint venture partner to amend his statement of claim to include an allegation that it was an implied term of a joint venture agreement that the defendant would carry out his duties as director of the joint venture company in good faith. Whilst a shareholder would not have such a right against the director under the general rule in *Foss v Harbottle* (1843) 2 Hare 461; Appendix 29, it was considered arguable that the joint venture agreement itself imposed a fiduciary duty on the defendant not to behave in such a way as to increase his fellow venturer's exposure under a guarantee.



89. I understand that under the terms of the SHA (clause 4.3.1) and ▬▬▬▬▬▬▬

90. The agreement between PNS and Kirwan as to the obligations owed by PNS and Kirwan does not immediately appear to have a bearing upon the obligations owed by Kirwan to the Financing Shareholders. However, clause 4.3.1 of the SHA does contain an undertaking by *inter alia* the Financing Shareholders to procure that PNS transfers the Shares as soon as reasonably practical and that its debt to Kirwan will be offset against the purchase price for the Shares. The fact that PNS is not in a position to repay the loans owed to Kirwan and that this was consented to by the Financing Shareholders does not mean that Kirwan is relieved of its obligations to the Financing Shareholders. On the other hand, when exercising their discretion as to whether or not an insolvency event has occurred, if the Financing Shareholders were to rely solely upon an inability to repay the Loans on the part of Kirwan, knowing that this inability to repay has been circumstances of which they were both aware and in agreement with, I consider it is arguable that the exercise of discretion in those circumstances is unreasonable, i.e. in bad faith, arbitrary, perverse or capricious. However, I do not consider that this is obviously the case and cannot say that an English Court would be likely to make such a finding; it would depend upon all the circumstances.

91. Furthermore in the above circumstances the Financing Shareholders may be prevented from determining that an insolvency event has occurred and demanding repayment of the loans through the concept of estoppel by convention because of the common understanding between Kirwan, Mr. Lynch and the Financing Shareholders that Kirwan

would not repay the loans until after the acquisition of the Shares and distribution of the Yukos Finance assets[39].

**2.6   Can the provision of clause 5(ii) of the loan agreements be interpreted so as to allow the Financing Shareholders to benefit from their own breaches of the SHA which resulted in the dissipation of Kirwan's funds?**

92.   If Kirwan has incurred expenses such that an "insolvency event" may be deemed to have occurred, but those expenses were caused by breaches of the SHA on the part of the Financing Shareholders, I consider it is arguable under English law that the exercise of the Financing Shareholders' discretion (whether to decide that this amounts to an insolvency event, or that one has in fact occurred) has been exercised unreasonably, i.e in bad faith, arbitrarily, perversely or capriciously. Further, where the Financing Shareholders have caused an insolvency event to occur by reason of breaches of the SHA, even if this entitles them to exercise clause 5(ii) of the loan agreements, I would consider it likely that Kirwan would have a counterclaim in damages for breach of the SHA and/or would be able to obtain an injunction to prevent the arbitrary and unreasonable exercise of the discretion under the loan agreements.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on 6th June 2016 in London, England

Ming-Yee Shiu

Littleton Chambers

3 King's Bench Walk South

Temple, London EC4Y 7HR

---

[39] *Amalgamated Investments & Property Co v Texas Commerce International Bank* [1982] 1 QB 84, Appendix 30; *The Vistafjord, Norwegian American Cruises v Paul Munday* [1988] 2 Lloyd's Rep 343; Appendix 31.